## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

NATIONAL ASSOCIATION OF SOCIAL WORKERS and

WOMEN HAVE OPTIONS, INC.,

     *Plaintiffs*,

     v.

CITY OF LEBANON, OHIO,

MARK MESSER, in his official capacity as
    Mayor,

SCOTT BRUNKA, in his official capacity as
    City Manager,

MARK YURICK, in his official capacity as
    City Attorney, and

JEFFREY MITCHELL, in his official
    capacity as Chief of Police,

     *Defendants*.

Case No. 1:22-cv-258

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# TABLE OF CONTENTS

JURISDICTION AND VENUE ................................................................................................ 3

PARTIES ............................................................................................................................... 4

LEGAL BACKGROUND ...................................................................................................... 6

FACTUAL ALLEGATIONS .................................................................................................. 7

    I.      The Availability of Abortion in Lebanon and Ohio ................................................. 7

    II.     Lebanon's Unconstitutional Ban ............................................................................ 11

    III.    Injury to Plaintiffs ................................................................................................. 17

        A.    National Association of Social Workers ................................................... 17

        B.    Women Have Options – Ohio ................................................................... 24

CLAIMS FOR RELIEF ....................................................................................................... 27

    Count One (Violation of Due Process – Void for Vagueness, U.S. Const.
        amend. XIV, 42 U.S.C. § 1983) ............................................................................. 27

    Count Two (Violation of Free Speech, U.S. Const. amends. I and XIV,
        42 U.S.C. § 1983) .................................................................................................. 27

    Count Three (Home Rule, Ohio Const. art. XVIII § 3) ..................................................... 28

REQUEST FOR RELIEF ..................................................................................................... 28

Plaintiffs the National Association of Social Workers ("NASW") and Women Have Options – Ohio ("WHO/O") hereby sue Defendants the City of Lebanon, Ohio; Mark Messer, in his official capacity as Mayor; Scott Brunka, in his official capacity as City Manager; Mark Yurick, in his official capacity as City Attorney; and Jeffrey Mitchell, in his official capacity as Chief of Police, and allege as follows:

1.      This case concerns whether a municipal government may enact a vague, sweeping ordinance that can be interpreted to criminalize virtually all activity even tangentially connected to abortion without providing fair notice of the specific conduct it forbids. Specifically, it concerns an ordinance passed by Defendant City of Lebanon and enforced by the Defendant municipal officers that criminalizes abortion, as well as an ill-defined but potentially extraordinarily broad range of efforts to "aid or abet" obtaining an abortion (the "Lebanon Ban" or "Ban"). *See* Lebanon, Ohio Code of City Ordinances §§ 509.09, 509.10.

2.      The Lebanon Ban also flies in the face of the constitutional right recognized by *Roe v. Wade*, which has been the law of the land for almost fifty years. But whatever the constitutional status of the right to terminate a pregnancy, the Ban deprives the public—including both pregnant persons and those who seek to provide them with assistance—of fair notice as to what the law proscribes and infringes upon other constitutional protections.

3.      More specifically, the Lebanon Ban renders it "unlawful for any person to procure or perform an abortion of any type and at any stage of pregnancy in the city of Lebanon, Ohio." Lebanon Code § 509.09(A). But it does not stop there. It also purports to ban any "abortion in violation of any statute enacted by the Ohio legislature," whether it occurs in Lebanon or not. *Id.* § 509.10(B). And it further forbids "any person to knowingly aid or abet" a prohibited abortion, a proscription that "includes, but is not limited to," several enumerated acts, like "'abortion

1

doula' services," that are themselves left undefined. *Id.* §§ 509.09(B), 509.10(C). Violation of the Ban constitutes a first-degree misdemeanor. *Id.* §§ 509.09(J); 509.10(J).

4.      The Lebanon Ban also includes several exceptions and affirmative defenses apparently intended to save the law from challenge. But those exceptions and defenses simply exacerbate the law's vagueness problem, as they incorporate legal standards, derived from a large, complex, and sometimes evolving body of constitutional law, that are not familiar to the average person. For example, the Ban purports to exempt from prosecution—and/or offer an affirmative defense to—some of those who would have "third-party" standing to assert an "undue burden" claim, as well as some of those whose prosecution would violate the First or Fourteenth Amendment. *Id.* §§ 509.09(F), 509.10(C), (D), (E).

5.      The Ban's vagueness, coupled with its potentially sweeping breadth, render it unlawful. The Due Process Clause of the Fourteenth Amendment mandates that the government cannot impose criminal penalties without providing fair notice of the conduct it seeks to proscribe, particularly when it impinges on constitutional rights, including First Amendment rights. Yet the Ban asks ordinary citizens, including Plaintiffs and their members, staff, and volunteers, to interpret and apply complex, nuanced legal concepts in order to determine whether their conduct is likely to subject them to prosecution.

6.      Moreover, notwithstanding the Ban's fig leaf of a First Amendment exemption, the Ban plainly sweeps in activities, like advising pregnant persons about their options, that constitute protected speech.

7.      Finally, insofar as it purports to enforce existing but unenforceable state criminal abortion bans by making them into municipal-level misdemeanor offenses, the Lebanon Ban

violates a longstanding, bright-line rule under the Home Rule provision of the Ohio Constitution. Ohio Const. art. XVIII, § 3.

8.     Plaintiffs the National Association of Social Workers and Women Have Options – Ohio are organizations that reasonably fear criminal prosecution for themselves or their members, employees, or volunteers under the Lebanon Ban. The Ban exposes NASW's members, social workers across the State of Ohio, and WHO/O's Ohio-based staff and volunteers to the risk of criminal prosecution without providing fair notice and in violation of their constitutional rights. In the face of such a vague ordinance, NASW and WHO/O must divert their resources to ensuring they can continue to provide services to their clients and members—reallocating staff time, spending money on things like procuring legal advice, and generally trying to shield themselves and their members from the Sword of Damocles the Lebanon Ban dangles over them.

9.     WHO/O and NASW's injuries exemplify the pitfalls of establishing criminal penalties without providing constitutionally adequate notice to the public. So long as the Lebanon Ban remains in effect, people across Ohio are forced to worry about whether their activities might somehow run afoul of the Ban. For these reasons, the Court should declare the Lebanon Ban unlawful in whole or in part and preliminarily and permanently enjoin Defendants from enforcing it.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under federal law and under 28 U.S.C. §§ 1343(a)(3) and (a)(4) because Plaintiffs seek to vindicate their federal civil rights under 42 U.S.C. § 1983.

11.     The Court has supplemental jurisdiction over the state-law claims asserted in this action under 28 U.S.C. § 1367 because they are so related to the federal claims asserted herein that they form part of the same case or controversy.

12.     Venue is proper in this district under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in the district.

## PARTIES

13.     Plaintiff the National Association of Social Workers is the preeminent professional membership organization for social workers in Ohio. Out of the 27,000 licensed social workers in Ohio, approximately 4,700 are members of NASW, including 1,500 in Warren County and surrounding counties, and seven who list their primary address within Lebanon, Ohio. NASW brings this lawsuit on behalf of itself and its members.

14.     NASW employs three full-time staff members in Ohio, all of whom are also social workers. The mission of NASW is to strengthen, support, and unify the social work profession, to promote the development of social work standards and practice, and to advocate for social policies that advance social justice and diversity. NASW is the recognized voice for social workers in Ohio and the most prominent resource on ethics and social work practice guidelines for both members and non-members alike. To that end, NASW provides continuing education materials, practice resources, and mentorship to its members. Such efforts include consulting with members on how to meet their ethical obligations to clients while complying with state and local laws and regulations.

15.     NASW members both work in Lebanon and provide services remotely to clients in Lebanon. They deal with a broad range of issues when providing assistance to clients, and abortion and pregnancy counseling are frequent topics. NASW members therefore regularly

4

engage in practices that could subject them to the threat of prosecution under the Lebanon Ban and/or whose legality they cannot determine due to the ordinance's vagueness.

16.     Plaintiff Women Have Options – Ohio is a nonprofit corporation organized under the laws of the State of Ohio. Founded in 1992, WHO/O is dedicated to helping Ohioans afford their reproductive choices. WHO/O is a founding member of the National Network of Abortion Funds, which includes more than a hundred abortion funds around the United States and overseas.

17.     WHO/O provides financial aid and practical support in the form of transportation, housing, and other assistance to help patients access contraception, emergency contraception, and abortion services. Since 1992, WHO/O has helped thousands of Ohioans access reproductive health care. WHO/O staff members and volunteers regularly engage in practices that could subject them to the threat of prosecution under the Lebanon Ban and/or whose legality they cannot determine due to the ordinance's vagueness.

18.     Defendant the City of Lebanon is a municipal corporation located in the State of Ohio.

19.     Defendant Mark Messer is sued in his official capacity as Mayor of Lebanon, Ohio. As Mayor, his responsibilities are to "preside at Council meetings, when present, and … vote on all matters which come before Council," although he lacks veto power. Although his role is primarily "ceremonial" and he lacks "administrative authority," Lebanon Code § 2.07, the Lebanon Ban requires him, in certain circumstances, to rewrite the ordinance if it is enjoined by a court, *id.* §§ 509.09(I)(5), (6), 510.10(H)(5), (6).

20.    Defendant Scott Brunka is sued in his official capacity as City Manager of Lebanon, Ohio. He is the chief executive and administrative officer of the municipality. *Id.* § 113.01.

21.    Defendant Mark Yurick is sued in his official capacity as City Attorney of Lebanon, Ohio. He is responsible for supervising and/or initiating criminal prosecutions by the City of Lebanon. *Id.* § 119.01.

22.    Defendant Jeffrey Mitchell is sued in his official capacity as Chief of Police of Lebanon, Ohio. As Chief of Police, he is responsible for investigating criminal offenses and arresting suspected offenders in the City of Lebanon. *Id.* § 121.02.

23.    In suing each of these Defendants, Plaintiffs seek to obtain only injunctive and/or declaratory relief.

## LEGAL BACKGROUND

24.    Although the U.S. Supreme Court has repeatedly reaffirmed for nearly fifty years that complete bans on abortion are unconstitutional and offend the Constitution's privacy guarantee, the rights to make decisions about one's own reproductive health and to engage in abortion-related services and speech are also protected by a number of other constitutional rights and doctrines.

25.    One of those protections is the vagueness doctrine, which recognizes that a state violates the Fourteenth Amendment's Due Process Clause when it "take[s] away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). That is "especially true where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights," like the rights

to engage in constitutionally protected speech or to obtain an abortion. *Colautti v. Franklin*, 439 U.S. 379, 391 (1979).

26.     The First Amendment also protects certain activities to the extent they constitute protected speech. "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Alvarez*, 567 U.S. 709, 716 (2012). Courts have repeatedly held that this includes information about abortion. *See, e.g.*, *Bigelow v. Virginia*, 421 U.S. 809, 822 (1975) (advertisements for abortion services are protected speech); *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1259-60 (10th Cir. 2016) (holding that there is a "First Amendment right" to "advocate[] for abortion rights"); *Planned Parenthood of Cent. & N. Arizona v. State of Ariz.*, 718 F.2d 938, 944 (9th Cir. 1983) ("[T]he state … may not unreasonably interfere with the right of Planned Parenthood to engage in … abortion-related speech activities);

27.     In addition, the Ohio Constitution constrains the authority of municipalities to regulate. Article XVIII, Section 3 of the Ohio Constitution—often referred to as the "Home Rule Amendment"—grants municipalities "authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." Under that provision, it is considered a conflict with state law when a municipality makes something a misdemeanor that is a felony under state law. *See, e.g.*, *Mendenhall v. City of Akron*, 881 N.E.2d 255, ¶ 35 (Ohio 2008).

## FACTUAL ALLEGATIONS

**I.**     **The Availability of Abortion in Lebanon and Ohio**

28.     Even before the Lebanon Ban, Lebanon lacked any clinics that perform abortions within its city limits, and it still does not have any such facilities. Instead, people who live in Lebanon must travel to facilities in other cities to access abortion care. For example, Planned

Parenthood provides abortions up to 21 weeks, 6 days from a person's last menstrual period ("LMP") [1] at its Cincinnati Surgical Center (approximately 31 miles from Lebanon) and 17 weeks, 6 days at its East Columbus Surgical Center (approximately 84 miles away). Women's Med Center Dayton (approximately 19 miles away) provides abortions through 21 weeks, 6 days LMP. And Your Choice Healthcare in Columbus (approximately 91 miles away) provides abortion through 9 weeks, 6 days LMP. Four additional clinics are located further away, in the Toledo and Cleveland-Akron areas.

29.     There are two types of abortion: procedural (or "surgical") and medication. Medication abortion involves a safe and effective regimen that was approved by the FDA two decades ago.[2] As part of that regimen, two drugs are taken orally. The first drug, mifepristone, must be taken 24 to 48 hours before the second drug, misoprostol.[3] Medication abortion is legal in Ohio through 70 days LMP.[4]

30.     In Ohio, obtaining an abortion requires an initial in-person visit with a physician for state-mandated counseling and informed consent, including detecting the fetal heart tone, offering the patient an opportunity to see or hear it, and informing the patient of the statistical likelihood of carrying the pregnancy to term if the abortion were not performed. Ohio Rev. Code

---

[1]     Length of pregnancy is generally measured from a patient's last menstrual period.

[2]     *Mifeprex (mifepristone) Information*, Food & Drug Admin. (Dec. 16, 2021), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/mifeprex-mifepristone-information. Complications occur in less than one half of one percent of cases—a complication rate that is lower than that for common procedures such as wisdom teeth removal. *Medication Abortion*, Guttmacher Inst. (Feb. 1, 2021), https://www.guttmacher.org/evidence-you-can-use/medication-abortion; Guido R. Sigron et al., *The Most Common Complications After Wisdom Teeth Removal*, 124 Swiss Dental J. 1042, 1042 (2014), https://pubmed.ncbi.nlm.nih.gov/25342545/ (documenting an 8.4% complication rate for wisdom teeth removal).

[3]     *Mifeprex*, *supra* note 2.

[4]     *Id.*; Ohio Rev. Code § 2919.123.

§§ 2317.56(B), 2919.192 *et seq*. Ohio law requires all patients to wait at least 24 hours after the state-mandated informed consent process before receiving the abortion. *Id.* § 2317.56.

31.    If the patient decides to proceed, the mifepristone is dispensed to the patient in the clinic.[5] The patient also receives the misoprostol or a prescription for misoprostol to take with them. The misoprostol is taken 24 to 48 hours later at a location of the patient's choosing.[6] Approximately 2 to 24 hours after taking the second medication, the patient will experience a process that is similar to an early miscarriage.[7]

32.    Whether a patient obtains a surgical or medication abortion, they may require assistance or counseling in evaluating their options; locating an appropriate clinic; making travel plans (especially considering that there are no abortion providers in Lebanon); arranging child care (since roughly 59% of abortion patients already have a child);[8] figuring out how to pay for the abortion; and handling other miscellaneous issues.

33.    Some of these tasks are similar to the work done by abortion doulas. Although there is no single or widely accepted definition of what tasks constitute serving as an "abortion doula," abortion doulas generally give emotional, physical, and informational support to people obtaining medical and surgical abortions. These concepts are broad, however, and could encompass a wide variety of services, given that people who obtain abortions often have a wide

---

[5]    *Mifeprex*, *supra* note 2 (noting that mifepristone may only be dispensed by clinics, medical offices, hospitals, and certified pharmacies); Ohio Rev. Code § 2919.123.

[6]    *Mifeprex*, *supra* note 2 (explaining that the misoprostol should be taken "at a location appropriate for the patient").

[7]    *Mifeprex Medication Guide*, Danco Laboratories LLC 17 (Mar. 2016), https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf#page=16.

[8]    *Induced Abortion in the United States*, Guttmacher Inst. (Sept. 2019), https://www.guttmacher.org/fact-sheet/induced-abortion-united-states (2014 data).

variety of needs. Not all abortion doulas provide the same services or provide them in the same ways.

34.     For example, abortion doulas have explained that their services can include referring patients to help lines, wiping away tears, holding hands during the procedure, offering a blanket, providing juice or water after the procedure, lending a kind ear, talking with the patient about their choice to have an abortion, talking about something entirely different (like the patient's commute or her favorite tv shows), correcting misinformation about abortion, and sometimes just sitting in supportive silence.[9] The terms "abortion doula" or "abortion doula services" may therefore have different meanings depending on context.

35.      Some organizations offer 6-week training courses leading to certification as an abortion doula.[10] However, no certification is required in order to serve as an abortion doula, and many people who serve as abortion doulas are not certified.[11]

36.     Ohio has passed several restrictions on abortion that have subsequently been enjoined. For example, Ohio Revised Code section 2919.195 prohibits abortions after fetal cardiac activity can be detected (*i.e.*, at or after approximately six weeks of pregnancy), but that prohibition was enjoined in *Preterm-Cleveland v. Yost*, 394 F. Supp. 3d 796, 804 (S.D. Ohio

---

[9]     *See, e.g.*, Alice Markham-Cantor, *Why Abortion Doulas Matter, Even When We're Just Showing Up*, The Nation (Dec. 9, 2019), https://www.thenation.com/article/archive/abortion-doula-clinics/; Augusta MacQueen, *I'm An Abortion Doula—Here's What I Do and See During A Typical Shift*, Self (June 1, 2017), https://www.self.com/story/abortion-doula.

[10]    *See, e.g.*, *Abortion Doula Training*, Hamsa House, https://hamsahouse.info/abortion-doula-training (last visited May 11, 2022) (for Cincinnati training); *Abortion Doula Training*, The Abortion Project, https://www.theabortionproject.com/abortion-doula-training (last visited May 11, 2022) (for online training).

[11]    *Abortion Doula Training Information and Opportunities*, Doula Training Guide (Jul. 2021), https://doulatrainingguide.com/2021/07/abortion-doula-training-information-and-opportunities.html#:~:text=Abortion%20doulas%20have%20no%20conventional,order%20to%20work%20as%20one.

2019). Ohio Revised Code Section 2919.15 prohibits abortions performed using the most common second-trimester method of abortion, known as dilation and evacuation, or D&E,[12] but that law was similarly enjoined in large part in *Planned Parenthood Sw. Ohio Region v. Yost*, 375 F. Supp. 3d 848, 872 (S.D. Ohio 2019). Thus, abortions after six weeks, including D&E abortions that are permitted under the current federal court injunction, remain available in Ohio.

## II.    Lebanon's Unconstitutional Ban

37.    The Lebanon Ban contains a sweeping prohibition on efforts to procure or facilitate an abortion—even though the right to obtain an abortion remains constitutionally protected, and even though there are no abortion clinics within Lebanon city limits.

38.    Anti-abortion activists have mounted a national campaign to encourage municipalities to adopt sweeping local bans on abortion. That campaign has been led by an activist from Texas, Mark Lee Dickson, the director of a small non-profit named Right to Life of East Texas.[13] Mr. Dickson has been remarkably candid in expressing the intent behind these ordinances, which includes retroactively subjecting individuals who provide or assist an abortion to liability without due process. According to Mr. Dickson, "The idea is this: in a city that has

---

[12]    Megan K. Donovan, *D&E Abortion Bans: The Implications of Banning the Most Common Second-Trimester Procedure*, Guttmacher Inst. (Feb. 21, 2017), https://www.guttmacher.org/gpr/2017/02/de-abortion-bans-implications-banning-most-common-second-trimester-procedure.

[13]    Jessica Glenza, *The Tiny American Towns Passing Anti-Abortion Rules*, The Guardian (Apr. 27, 2021), https://www.theguardian.com/world/2021/apr/27/us-tiny-towns-anti-abortion-ordinances; *see also Home*, Sanctuary Cities for the Unborn, https://sanctuarycitiesfortheunborn.com/ (last visited May 11, 2022) (providing contact information for Mr. Dickson).

outlawed abortion, in those cities if an abortion happens, then later on when *Roe v. Wade* is overturned, those penalties can come crashing down on their heads."[14]

39.    To that end, these local bans generally not only ban abortion within the city's limits, but also target anybody who "aids or abets" an abortion, often with criminal penalties and/or financial liability.[15]

40.    On May 25, 2021, Lebanon became the first city in the State of Ohio to adopt one such ban.[16] The Ban was adopted as an emergency measure, which meant that it took effect immediately. Lebanon Code § 510.10(K).

41.    Lebanon is currently the only city in Ohio with a municipal abortion ban. Although Mason, Ohio passed a ban on October 25, 2021, it repealed that ordinance two months later.[17] Similar bans were introduced but rejected in Celina[18] and London.[19]

---

[14]    Harmeet Kaur, *Small Towns in Texas are Declaring Themselves 'Sanctuary Cities for the Unborn,'* CNN (Jan. 25, 2020), https://www.cnn.com/2020/01/25/us/sanctuary-cities-for-unborn-anti-abortion-texas-trnd/index.html.

[15]    *Id.*

[16]    Courtney King & Brian Planalp, *Lebanon Becomes Ohio's First 'Sanctuary City' for Unborn*, Fox19 (May 25, 2021), https://www.fox19.com/2021/05/25/lebanon-becomes-ohios-first-sanctuary-city-unborn/.

[17]    Luke Jones, *Mason Votes to Repeal Abortion Ordinance*, Local 12 (Dec. 13, 2021), https://local12.com/news/local/mason-votes-to-repeal-abortion-ordinance-term-trimester-terminate-pregnancy-pro-life-pro-choice-planned-parenthood-clinic-reproductive-rights-womens-rights-mason-city-council-sanctuary-city-lebanon-cincinnati-ohio.

[18]    *Celina City Council Votes Against Abortion and Sanctuary City Ordinance 4-2*, Mercer Cnty. Outlook (Oct. 26, 2021), https://mercercountyoutlook.net/2021/10/26/celina-city-council-votes-against-abortion-and-sanctuary-city-ordinance-4-2/.

[19]    *London Abortion Ban Fails in City Council Vote*, 10 WBNS (Nov. 18, 2021), https://www.10tv.com/article/news/local/london-city-council-does-not-pass-abortion-ban-ohio/530-c032ea7e-cc70-4e8b-8b25-59ba83c15bc4.

42. The Lebanon Ban passed unanimously "after the lone council member to oppose the vote, Krista Wyatt, resigned … , citing what she described as a hyper-partisan political faction that has 'hijacked' Lebanon's legislative agenda."[20]

43. The Ban enacts two new criminal provisions into Lebanon's municipal code, found at Sections 509.09 and 509.10, both of which create first-degree misdemeanors.

44. Section 509.09(A) provides that "[i]t shall be unlawful for any person to procure or perform an abortion of any type and at any stage of pregnancy in the city of Lebanon, Ohio."

45. That section of the ordinance defines abortion to mean "the act of using or prescribing an instrument, a drug, a medicine, or any other substance, device, or means with the intent to cause the death of an unborn child of a woman known to be pregnant." Lebanon Code § 509.09(H). This language does not specify whether medication abortions occur "in the city of Lebanon, Ohio" when the second dose (*i.e.*, the misoprostol) is taken within city limits.

46. Unlike Section 509.09, Section 509.10 lacks any tether to the city limits of Lebanon; it instead provides that "[i]t shall be unlawful for any person to perform an abortion in violation of any statute enacted by the Ohio legislature." Lebanon Code § 509.10(B).

47. Both sections render it unlawful "for any person to knowingly aid or abet" a prohibited abortion. That proscription "includes, but is not limited to, the following acts":

(1) Knowingly providing transportation to or from an abortion provider;

(2) Giving instructions over the telephone, the internet, or any other medium of communication regarding self-administered abortion;

(3) Providing money with the knowledge that it will be used to pay for an abortion or the costs associated with procuring an abortion;

(4) Providing "abortion doula" services; and

---

[20] King & Planalp, *supra* note 16.

13

(5)     Coercing a pregnant mother to have an abortion against her will.

Lebanon Code §§ 509.09(B), 509.10(C).

48.     Section 509.10 (but not § 509.09) also proscribes "[e]ngaging in conduct that makes one an accomplice to abortion under section 2923.03 of the Ohio Revised Code." *Id.* § 509.10(C)(6).

49.     Beyond the non-exhaustive enumerated list full of undefined terms in sections 509.09(B) and 509.10(C), the Lebanon Ban provides no guidance regarding what conduct will be understood to constitute aiding and abetting an unlawful abortion.

50.     The list itself also poses more questions than it answers. For example, the term "abortion doula" services could potentially encompass the provision of many different kinds of information and emotional support. Likewise, it is unclear whether "[p]roviding money" to defray "costs associated with procuring an abortion" encompasses funds for things like transportation, housing, food, child care, and other expenses other than the cost of the abortion itself, and it is unclear whether donors to WHO/O may be at risk of prosecution if helping to pay for such expenses. It is also unclear whether "self-administered abortion"—which is not defined—includes medication abortions where the second step of the protocol, taking misoprostol, is performed at home.

51.     Section 509.09(D) also renders it "unlawful for any person to possess or distribute abortion-inducing drugs in the city of Lebanon, Ohio." The term "abortion-inducing drugs" is defined to include "mifepristone, misoprostol, and any drug or medication that is used to terminate the life of an unborn child." *Id.* § 509.09(H)(3). But it is unclear whether someone who drives a patient home from an abortion clinic with misoprostol would be considered to "possess" misoprostol, and under what circumstances.

14

52.     Because Section 509.10 contains no geographic limitation, a person who takes steps in Lebanon to assist another person in obtaining an abortion outside of Lebanon after fetal cardiac activity can be detected (*i.e.*, at or after approximately six weeks of pregnancy), in violation of Ohio Revised Code section 2919.195, could be subject to criminal prosecution, despite the federal court injunction that is currently in place. *See Preterm-Cleveland*, 394 F. Supp. 3d at 804. Moreover, the Lebanon Ban makes violation of Ohio Revised Code section 2919.195 a first-degree misdemeanor, whereas it is a fifth-degree felony under state law. *See* Ohio Rev. Code § 2919.195(A); Lebanon Code § 509.10(J). In fact, the Ban specifically references Ohio's six-week abortion ban in several places.

53.     Similarly, a person who helps someone get an abortion that is performed by dilation and evacuation could be subject to prosecution under the Lebanon Ban, even though that law has also been enjoined in large part. Ohio Rev. Code § 2919.15; *see Planned Parenthood Sw. Ohio Region*, 375 F. Supp. 3d at 872. The Lebanon Ban makes violation of Ohio Revised Code section § 2919.15 a first-degree misdemeanor, although it is a fourth-degree felony under state law. Ohio Rev. Code § 2919.15(C); Lebanon Code § 509.10(J).

54.     Both sections also exempt "any conduct protected by the First Amendment," while at the same time explicitly criminalizing a significant amount of activity that likely constitutes protected speech, including providing information and emotional support. Lebanon Code §§ 509.09(F), 509.10(C).

55.     Section 509.09 also exempts "any action which occurs outside of the jurisdiction of the city of Lebanon, Ohio," and any actions committed by "the mother of the unborn child" or "the pregnant woman who seeks to abort her unborn child." *Id.* §§ 509.09(E), (G). But those exemptions only raise further questions, including whether the section encompasses

15

communications by individuals outside Lebanon with people inside Lebanon, such as providing
counseling, funding, or instructions over the phone for a self-managed abortion.

56.     Although it lacks Section 509.09's exceptions for actions outside Lebanon and
actions committed by the pregnant person—and, unlike Section 509.09, appears to apply to
abortions that occur both within and outside of Lebanon—Section 509.10 both exempts, and
provides an affirmative defense to, anyone who *both* "has standing to assert the third-party rights
of a woman or group of women seeking an abortion under the tests for third-party standing
established by the Supreme Court," *and* "demonstrates that his prosecution or punishment will
impose an undue burden on that woman or group of women seeking an abortion." However, the
Lebanon Ban then attempts to narrow the legal definition of "undue burden" by providing that
the fact that "the imposition of civil or criminal liability will prevent women from obtaining
support or assistance" to obtain an abortion does not constitute an undue burden. Moreover,
Section 509.10's affirmative defense becomes unavailable if the Supreme Court "overrules" *Roe*
or *Casey*. *Id.* §§ 509.10(D), (E), (F).

57.     These exemptions and affirmative defenses are couched in legalese that is unclear
and difficult to apply, even for many trained lawyers. Specifically, the concepts "third-party
standing," "undue burden[s]," whether or not *Roe* and *Casey* have been "overrule[d]," and
"speech or conduct protected by the First Amendment"— are complex, are likely unfamiliar to a
lay audience, and continue to evolve over time. The Ban thus leaves average people, including
Plaintiffs, their employees, their volunteers, and/or their members, uncertain as to whether their
conduct is likely to subject them to criminal prosecution.

58.     Finally, in an apparent effort to insulate the Lebanon Ban from invalidation, both
Sections 509.09 and 509.10 contain lengthy severability clauses that would require courts and in

some instances the Mayor to engage in extensive rewriting of the ordinance. *Id.* §§ 509.09(I), 509.10(I). However, Ohio courts have repeatedly held that severability clauses are ineffective if a statute's provisions cannot be severed, or if doing so would extend the statute's reach.

59.     The vague terms of the Lebanon Ban invite arbitrary enforcement by forcing police, prosecutors, juries, and other public officials to make arbitrary determinations of whether particular conduct is covered by the Ban.

60.     Indeed, those charged with enforcing the Ban have already acted arbitrarily. An individual made a report to the Lebanon police concerning the sale of mifepristone and misoprostol at Walgreens, a national pharmacy chain with a store in Lebanon. However, the police declined to investigate or bring charges against the store or any other Lebanon pharmacies that may sell these drugs, even though doing so appears to violate the Ban. It is unclear whether the police have a narrower construction of the Ban than its plain text would indicate, or if police are picking and choosing whom to prosecute based on unarticulated standards.

**III.     Injury to Plaintiffs**

61.     The unlawful Lebanon Ban harms the National Association of Social Workers and Women Have Options – Ohio by, among other things, exposing Plaintiffs, their employees, their volunteers, and/or their members, to the threat of criminal prosecution and forcing them to divert resources to respond to the Ban.

**A.     National Association of Social Workers**

62.     NASW has been injured in two ways: (1) its members provide services, including counseling and resources, that may be proscribed by the Lebanon Ban; and (2) the Ban frustrates NASW's organizational mission and forces it to divert resources in response.

63.     NASW's national policy position is that reproductive freedom is a human right, and that social workers may have an ethical obligation to assist a client wishing to exercise that

right.[21] The mission and purposes of NASW, with its Ohio chapter, include strengthening, supporting, and unifying the social work profession; promoting the development of social work standards and practice; and advocating for social policies that advance social justice and diversity.

64.    In furtherance of its mission of assisting and supporting social workers in their professional practice, NASW provides guidance to social workers when they have practice questions or ethics concerns, including when the NASW *Code of Ethics* or policy positions have the potential to conflict with municipal, state, or federal law. Prosecution or arrest for violating the law during the practice of social work may jeopardize a social worker's license. Guidance is therefore one way that NASW attempts to protect individual members' licenses to practice.

65.    Depending on the nature of the issue, NASW may disseminate practice guides or other materials to inform social workers about best practices. NASW may also answer specific questions raised by individual social workers. Due to frequently changing abortion laws, practice questions from Ohio members about abortion are frequent.

66.    NASW has 4,700 members within the state, with 1,500 members in Warren County and its bordering counties, and 7 members with primary addresses in Lebanon specifically. These members pay dues to NASW and are entitled to elect both state and federal leadership. In addition, many members based outside Lebanon provide services within Lebanon, including through telehealth services, through home calls, and at specific facilities.

67.    NASW members come into contact with issues of pregnancy and reproductive health in a multitude of circumstances. NASW members work in individual offices and practices,

---

[21]   Nat'l Ass'n of Social Workers, *Social Work Speaks: National Association of Social Workers Policy Statements* 275-76 (11th ed. 2018).

but also in social services agencies, hospitals, emergency rooms, rape crisis centers, substance abuse facilities, community health centers, schools, and many other settings. They provide services to adults, teenagers, individuals with developmental disabilities, and older adults. And many social workers deal with clients who have struggled with mental health issues. Clients in all of these categories experience pregnancies and require information and resources to pursue their available options.

68.     NASW members' work often relies on attempting to understand a client's needs so that they can help them reach decisions and obtain assistance to carry out those decisions. To that end, assistance by social workers is often phrased as questions or is in the form of objective information sharing. Once a baseline is established about the client's mental and emotional state, support network, and resources, a social worker may elect to refer the client to further treatment or resources, if needed. That is especially the case with respect to pregnancy counseling: in the case of an unwanted pregnancy, for example, a social worker might inform a client that abortion is legal in Ohio and counsel them regarding their options for the pregnancy. Of course, social workers do not seek to persuade their clients to obtain abortions or any particular course of reproductive health treatment, but instead aim to equip their clients with the information and resources to make their own reproductive health choices.

69.     As a result, NASW members regularly provide assistance that, depending on how it is interpreted, may violate the Lebanon Ban, including counseling and "abortion doula" services. Social workers often provide emotional support or information about reproductive health services, including but not limited to supporting clients' feelings and questions around abortion and presenting options for continuing or terminating a pregnancy. In some instances,

social workers may assist clients in determining how to obtain an abortion and/or where to find resources to aid in doing so.

70.     It is a common practice for a social worker to provide a referral either directly to an abortion facility or to another office to gain a secondary referral for an abortion, if the client requests. In some instances, the social worker will provide practical support by calling the clinic for the client to schedule the appointment or arranging transportation. The Lebanon Ban leaves these social workers uncertain as to whether they will be prosecuted for aiding and abetting an abortion if they work with a client located in Lebanon.

71.     In particular, some NASW members provide services that may be considered "abortion doula" services, including with respect to abortions that are prohibited under the Ban. Social workers often provide counseling around the abortion procedure. Both the counseling provided and the logistical support of calling a clinic, setting an appointment, or informing a client of the availability of funding and assistance with an abortion may fall under Lebanon's undefined prohibition on abortion doula services.

72.     Each of these services may or may not fall within the Lebanon Ban. It is unclear whether the counseling and resources that social workers provide as part of their ordinary duties may now constitute efforts to aid and abet prohibited abortions. Nor is it clear whether and when these activities run afoul of Lebanon's ordinance, particularly if a social worker located outside of Lebanon provides support to a person inside of Lebanon. Finally, it is entirely unclear whether any of these services might fit within the exceptions to the Ban. It is also unclear whether NASW members are "[p]ersons who lack third-party standing to assert the rights of women seeking an abortion under the tests for third-party standing established by the Supreme Court of the United States" or whether they are "[p]ersons for whom prosecution and punishment will not impose an

20

undue burden on women seeking abortions." Lebanon Code § 510.10(D)(2). Under the Lebanon Ban, NASW members would have to fall into both of these categories to avoid prosecution if any of their conduct fits the law's proscriptions.

73.     NASW's Executive Director, Danielle Smith, learned of the Lebanon Ban several months after it became law. After further investigation, she became concerned that it could have implications for NASW's members, including social workers counseling and assisting clients in Lebanon.

74.     On February 17, 2022, Ms. Smith emailed the Lebanon City Attorney, Defendant Mark Yurick, in an attempt to gain clarity on how the law might apply to NASW's members. However, Mr. Yurick's response increased Ms. Smith's concerns for NASW's members.

75.     First, Ms. Smith asked: "What services fall within 'abortion doula services' under the law?"

76.     Mr. Yurick responded: "In a general sense, an 'abortion doula' is a person who provides emotional, informational and/or logistical support to a person who is seeking or having an abortion."

77.     Second, Ms. Smith asked: "[W]hat kind of counseling related to abortion (including self-managed abortion) will and will not constitute aiding and abetting or make our members accomplices under this law?"

78.     Mr. Yurick responded: "I am not able to answer this hypothetical question. Please consult your own legal counsel for appropriate legal advice. I am not a psychiatrist, therapist or a counselor, and I am not familiar with all of the activities of those professions. Whether a particular activity falls within the reach of the ordinance would be evaluated on an individual 'case by case' basis."

79.     Third, Ms. Smith asked: "Does this ordinance apply only to social work services rendered entirely within Lebanon (*e.g.*, both the social worker and pregnant person are present in the city), or does it also apply when the social worker is remotely providing service to a Lebanon resident?"

80.     Mr. Yurick responded: "I am not able to answer this hypothetical question. Please consult your own legal counsel for appropriate legal advice. Whether a particular activity or set of activities falls within the jurisdiction of a particular law enforcement agency is a matter of law."

81.     Thus, in his response, Mr. Yurick did not suggest that these counseling services would fall outside the scope of the Lebanon Ban, nor that any of them would fall within the Ban's exceptions.

82.     Thus, NASW's Executive Director has learned from the lawyer for the City of Lebanon that, depending on how the Ban is interpreted by police and prosecutors, NASW members may be at risk of criminal prosecution, "on a case-by-case basis," for violating the Ban—which, again, appears to outlaw almost every form of emotional, mental, or physical support or information sharing for pregnant people prescribed by the NASW *Code of Ethics*.

83.     If the ordinance stands, significant time and resources would be needed to protect both NASW members and non-member social workers in Ohio. In order to effectively protect social workers, NASW would need to draft guidance and conduct webinars and tailored trainings to social workers who provide remote services, work in health care settings, or specialize in family planning services. Indeed, members have already expressed concern about the possibility of criminal prosecution. Some members noted that without clarity, they would not talk to any

client from Lebanon about any abortion or pregnancy issues. Others expressed that they want significant training on what they may and may not do.

84.     In particular, NASW has identified multiple members who provide services that could potentially fall within the scope of the Ban. Each of these members could face criminal prosecution, depending on how the Ban is interpreted and applied.

85.     Ms. Smith would feel ethically obligated to conduct further outreach by individually contacting every Ohio licensed social worker who (1) lives in Lebanon or (2) has potential clients in Lebanon, regardless of the social worker's physical presence in the city.

86.     To properly mitigate the risks of the ordinance to members, and provide adequate individual outreach and guidance, NASW would need to hire at least one full time employee for 3-6 months. This employee would need to create education materials, contact social workers, and inform members of the risks of Lebanon's ordinance. Three months would allow for guidance on the most basic level; effective, individualized responses would require a staffer to be employed for a much longer period of time, possibly years. NASW had no previous plans to hire additional staff before Lebanon's ordinance went into effect.

87.     Finally, when a social worker and/or client is from Lebanon, NASW may need, in the absence of further clarity, to advise the member that discussing abortion in any form, or even continuing a session if the topic arises, could jeopardize their license to practice. However, declining to discuss the topic of abortion would conflict with social workers' ethical obligation to promote the client's self-determination, particularly in light of NASW's national policy position that reproductive freedom is a human right.

23

B.      **Women Have Options – Ohio**

88.      WHO/O has been injured in two ways: (1) it provides resources and services that may be proscribed by the Ban; and (2) the Ban frustrates its organizational mission and forces it to divert resources in response.

89.      WHO/O believes that everyone should be able to make their own reproductive choices. WHO/O's mission is to make that belief a reality in Ohio by providing financial and practical assistance to those in need. This often includes various forms of support for individuals seeking to terminate their pregnancies, including medication abortions that occur at least partially within Lebanon and/or abortions that may violate enjoined and unenforceable Ohio laws, such as the ban on abortions after 6 weeks LMP.

90.      To carry out its mission, WHO/O relies on two paid full-time staff members, called "resource coordinators," and roughly thirty volunteers. While WHO/O is headquartered in Columbus, Ohio, it serves clients throughout the State of Ohio. WHO/O assisted 1020 patients in 2020 and 931 in 2021. Some of these patients were located in Lebanon.

91.      When a client contacts WHO/O for assistance, either via phone or email, WHO/O sets them up with a coordinator who assesses their situation and figures out their individual needs. WHO/O also sometimes receives referrals from other abortion funds, including national organizations. Under the Lebanon Ban, however, it is unclear whether even these initial consultations, intended to lay out a patient's options, would break the law if the patient happens to be located in Lebanon.

92.      WHO/O's assistance to clients seeking abortions takes various forms. However, it is unclear whether, among other things, several of these forms of assistance would constitute "aiding and abetting" an abortion; whether they would fall within the Lebanon Ban's exceptions for speech or undue burden; whether WHO/O staff and volunteers would have third-party

24

standing on behalf of their clients; or whether WHO/O's services would fall within the Ban at all, to the extent they are provided partially outside Lebanon city limits.

93.     Some of that assistance is in the form of cash grants directly to abortion clinics to help cover the cost of abortions for patients in need. Sometimes WHO/O provides financial assistance directly to patients to cover expenses associated with travel to an abortion clinic, or other needs associated with undergoing the procedure. Depending on an individual client's needs, WHO/O volunteers and staff may arrange rides for patients who lack transportation or child care for patients during their abortion procedure. They may also book hotel rooms for patients requiring an overnight stay, or help patients with obtaining documentation, such as a photo ID, needed for the procedure.

94.     WHO/O staff and volunteers also provide information about where a patient can obtain an abortion, and sometimes drive patients to and from an abortion clinic for an abortion procedure. If that patient goes to the clinic to seek a medication abortion, they will usually be sent home from the clinic with misoprostol pills (the second drug of the two-drug medication abortion regimen). It is unclear whether the information that WHO/O provides constitutes "instructions" within the meaning of the Lebanon Ban, whether simply providing information about available options constitutes "aiding or abetting" abortion, or whether the Ban's exemption for the First Amendment covers these fundamentally speech-based activities. It is also unclear whether transporting a patient from an abortion clinic with misoprostol constitutes "possession" of abortion-inducing drugs within the meaning of the Ban.

95.     All staff members of WHO/O have completed various training programs to become abortion doulas, and they offer abortion doula services to patients who request it. Both provide information and emotional support to people who are seeking or receiving abortions.

25

However, it is unclear which of the services they provide would be considered "abortion doula services" within the meaning of the Lebanon Ban, given that the term is susceptible of multiple meanings.

96.     It is also unclear whether WHO/O staff and volunteers are "[p]ersons who lack third-party standing to assert the rights of women seeking an abortion under the tests for third-party standing established by the Supreme Court of the United States" or whether they are "[p]ersons for whom prosecution and punishment will not impose an undue burden on women seeking abortions." Lebanon Code § 510.10(D)(2). Under the Lebanon Ban, WHO/O staff and volunteers would have to fall into both of these categories to avoid prosecution if any of their conduct fits the law's proscriptions.

97.     WHO/O has assisted patients who reside in Lebanon with accessing abortions in the past, and there is every reason to believe that patients who live in Lebanon and need to travel to abortion providers outside of Lebanon will seek out WHO/O's services in the future.

98.     After passage of the Lebanon Ban, WHO/O diverted, and has continued to divert, scarce time and resources to protect itself and its staff and volunteers from prosecution under the Lebanon Ban. For example, WHO/O had originally planned on establishing a volunteer-staffed hotline for providing support. However, because WHO/O is concerned about putting volunteers at risk of prosecution under the Ban, WHO/O has avoided asking unpaid staff to answer WHO/O's telephones and instead relies only on paid staff for that work. Doing so diverts the time of those staffers away from other organizational priorities.

99.     WHO/O has also sought legal advice regarding the possibility of prosecution under the Lebanon Ban, and has considered creating a legal committee or retaining counsel to

26

assess its compliance with the Ban. Doing so would further require WHO/O to divert staff time and financial resources away from providing assistance to clients.

100.    However, WHO/O's staff and volunteers remain dedicated to WHO/O's mission. Even if it places them at risk of prosecution, WHO/O's staff and volunteers will continue assisting any client needing assistance, including within the limits of the City of Lebanon. WHO/O, its staff, and its volunteers therefore have a reasonable fear of prosecution under the Ban.

## CLAIMS FOR RELIEF

### Count One
**(Violation of Due Process – Void for Vagueness, U.S. Const. amend. XIV, 42 U.S.C. § 1983)**

101.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

102.    By failing to provide adequate definition or clarification of its key terms and provisions, the Lebanon Ban fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.

103.    The potentially sweeping Ban also authorizes and encourages arbitrary and discriminatory enforcement.

104.    The Ban is vague at its core, in all of its applications, and as applied to the Plaintiffs' activities.

105.    The Ban is therefore unconstitutionally vague in violation of the Fourteenth Amendment's Due Process Clause.

### Count Two
**(Violation of Free Speech, U.S. Const. amends. I and XIV, 42 U.S.C. § 1983)**

106.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

107. By prohibiting, among other things, abortion-related speech, as well as any speech that conveys information or emotional support to a person seeking an abortion, the Lebanon Ban is a content-based restriction that infringes upon constitutionally protected speech.

108. The Ban fails strict scrutiny because it is not narrowly tailored to advance a compelling government interest.

109. The Ban also fails rational basis review. The government has no legitimate interest in altogether banning speech about a safe, legal, medical procedure.

110. For similar reasons, the Ban is both overbroad and vague; it sweeps far beyond any category of speech that may permissibly be regulated and forces the public to guess about what speech it permits.

111. The Ban therefore violates the First Amendment as incorporated against the states by the Fourteenth Amendment.

### Count Three
### (Home Rule, Ohio Const. Art. XVIII § 3)

112. Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

113. By prohibiting conduct that is denominated a felony under state law but punishing that conduct as a misdemeanor, the Lebanon Ban conflicts with state law. It therefore exceeds Lebanon's Home Rule Authority under Article XVIII, section 3 of the Ohio Constitution.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1. declare that the Lebanon Ban is unconstitutional on its face and as applied;

2. preliminarily and permanently enjoin Defendants and all those in active concert and participation with them from implementing the Ban;

28

3.      award Plaintiffs their costs, attorneys' fees, and other disbursements for this

action under 42 U.S.C. § 1988; and

4.      grant any other relief this Court deems appropriate.

Dated: May 11, 2022                          Respectfully submitted,

                                             */s/ B. Jessie Hill*
                                             B. Jessie Hill (0074770)
                                             Freda J. Levenson (0045916)
                                             Elena M. Thompson (0100287)
                                             Rebecca Kendis (0099129)*
                                             ACLU of Ohio Foundation
                                             1108 City Park Avenue, Ste. 203
                                             Columbus, OH 43206
                                             Phone: (216) 368-0553 (Hill)
                                             (614) 586-1972
                                             Fax: (614) 586-1974
                                             bjh11@case.edu
                                             flevenson@acluohio.org
                                             ethompson@acluohio.org
                                             rebecca.kendis@case.edu

                                             John Lewis (D.C. Bar No. 1033826)*
                                             Kristen Miller (D.C. Bar No. 229627)*
                                             Sean Lev (D.C. Bar No. 449936)*
                                             Democracy Forward Foundation
                                             P.O. Box 34553
                                             Washington, DC 20043
                                             (202) 601-2487
                                             jlewis@democracyforward.org
                                             kmiller@democracyforward.org
                                             slev@democracyforward.org

                                             *Counsel for Plaintiffs*

                                             * *pro hac vice* application to be filed