**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION OF SOCIAL WORKERS, et al., | |
| *Plaintiffs*, | |
| v. | Case No.  1:22-cv-258 |
| CITY OF LEBANON, OHIO, et al., | |
| *Defendants*. | |

**<u>DECLARATION OF B. JESSIE HILL</u>**

I, B. Jessie Hill, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.      I am over the age of 18. I make these statements based on my personal knowledge. I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction or, in the Alternative, Expedited Summary Judgment.

2.      A true and correct copy of Lebanon Ordinance 2021-053, titled *Ordinance Outlawing Abortion, Declaring Lebanon a Sanctuary City for the Unborn, Making Various Provisions and Findings, Providing for Severability, Establishing an Effective Date and Declaring an Emergency*, codified at Lebanon, Ohio, Code of City Ordinances §§ 509.09, 509.10 is attached as Exhibit A.

3.      A true and correct copy of *Mifeprex (mifepristone) Information*, Food & Drug Admin. (Dec. 16, 2021), <u>https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/mifeprex-mifepristone-information</u>, is attached as Exhibit B.

4. A true and correct copy of *Mifeprex Medication Guide*, Danco Laboratories LLC (Mar. 2016), https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf, is attached as Exhibit C.

5. A true and correct copy of a police report made to the Lebanon police concerning the sale of mifepristone and misoprostol, obtained by Plaintiffs' counsel through a third party, is attached as Exhibit D.

Dated: May 9, 2022

*/s/ B. Jessie Hill*
B. Jessie Hill

# HILL DECLARATION
# EXHIBIT A

ORDINANCE NO. 2021-053

**ORDINANCE OUTLAWING ABORTION, DECLARING LEBANON A SANCTUARY FOR THE UNBORN, MAKING VARIOUS PROVISIONS AND FINDINGS, PROVIDING FOR SEVERABILITY, ESTABLISHING AN EFFECTIVE DATE AND DECLARING AN EMERGENCY**

BE IT ORDAINED BY THE CITY COUNCIL OF LEBANON, OHIO THAT:

WHEREAS, there are currently no facilities within the corporate limits of the City of Lebanon, Ohio where an abortion may be legally performed; and,

WHEREAS, currently no woman is able to obtain an abortion within the corporate limits of the City of Lebanon, Ohio; and,

WHEREAS, no abortions are currently legally performed within the corporate boundaries of the City of Lebanon, Ohio; and

WHEREAS, if a woman chose to have an abortion, she would have several options within a reasonable distance of Lebanon, Ohio; and

WHEREAS, due to the complete absence of abortions or abortion facilities in Lebanon, Ohio, requiring a woman to exercise any right she may have to obtain an abortion to exercise that right outside the corporate boundaries of the City of Lebanon, Ohio is not a substantial burden to the exercise of that right under the Supreme Court's ruling in Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833 (1992).

**A. FINDINGS**

The City Council finds that:

(1) Human life begins at conception.

(2) Abortion is a murderous act of violence that purposefully and knowingly terminates an unborn human life.

(3) Unborn human beings are entitled to the full and equal protection of the laws that prohibit violence against other human beings.

(4) The Supreme Court's decision in Roe v. Wade, 410 U.S. 113 (1973), which invented a constitutional right for pregnant women to kill their unborn children through abortion, is a lawless and unconstitutional act of judicial usurpation, as there is no language anywhere in the Constitution that even remotely suggests that abortion is a constitutional right.

(5) Constitutional scholars have excoriated Roe v. Wade, 410 U.S. 113 (1973), for its lack of reasoning and its decision to concoct a constitutional right to abortion that has no textual foundation in the Constitution or any source of law. See John Hart Ely, The Wages of Crying Wolf: A Comment on Roe v. Wade, 82 Yale L.J. 920, 947 (1973) ("Roe

v. Wade . . . is *not* constitutional law and gives almost no sense of an obligation to try to be."); Richard A. Epstein, Substantive Due Process By Any Other Name: The Abortion Cases, 1973 Sup. Ct. Rev. 159, 182 ("It is simple fiat and power that gives [Roe v. Wade] its legal effect."); Mark Tushnet, Red, White, and Blue: A Critical Analysis of Constitutional Law 54 (1988) ("We might think of Justice Blackmun's opinion in *Roe* as an innovation akin to Joyce's or Mailer's. It is the totally unreasoned judicial opinion.").

(6) The Ohio Human Rights and Heartbeat Protection Act has outlawed and criminalized abortion statewide if the unborn child has a detectable heartbeat. See Ohio Rev. Code § 2919.195(A). The only exception is for abortions needed to prevent the death of the pregnant woman or to prevent a serious risk of the substantial and irreversible impairment of a major bodily function. See Ohio Rev. Code § 2919.195(B).

(7) Any person who performs an abortion in violation of the Ohio Human Rights and Heartbeat Protection Act, other than the pregnant woman upon whom the abortion is performed, is a criminal and felon who is subject to punishment of up to 12 months imprisonment and a fine of up to $2,500 for each illegal abortion performed. See Ohio Rev. Code §§ 2919.195(A); 2929.14(b)(5).

(8) Any person who aids or abets an abortion performed in violation of the Ohio Human Rights and Heartbeat Protection Act, other than the pregnant woman upon whom the abortion is performed, is a criminal and felon under the accomplice-liability provisions in section 2923.03 of the Ohio Revised Code, and is subject to punishment of up to 12 months imprisonment and a fine of up to $2,500 for each illegal abortion that the person aided or abetted.

(9) The federal judiciary has no ability or power to veto, erase, or formally revoke the Ohio Human Rights and Heartbeat Protection Act, and it has no power to block the Ohio Human Rights and Heartbeat Protection Act from taking effect. The judiciary's powers extend only to resolving cases and controversies between named parties to a lawsuit. The power of judicial review allows a court to decline to enforce a statute when resolving a case or controversy between named litigants, and it allows a court to enjoin government officials from taking steps to enforce a statute—though only while the court's injunction remains in effect. But the Ohio Human Rights and Heartbeat Protection Act will continue to exist, even if a court opines that it violates the Constitution, and it will remain the law of Ohio until it is repealed by the legislature that enacted it.

(10) Although a federal district court has temporarily enjoined the enforcement of the Ohio Human Rights and Heartbeat Protection Act, that ruling did not "strike down" the Ohio Human Rights and Heartbeat Protection Act or "block" it from taking effect. It merely prevents the named defendants in that lawsuit from bringing criminal charges or enforcing the statute against the named plaintiffs for as long as the court's ruling or injunction continues to exist.

(11) Individuals who violate the Ohio Human Rights and Heartbeat Protection Act after a court has declared the statute unconstitutional or enjoined government officials from enforcing it remain subject to future criminal prosecution and penalties if the injunction is vacated on appeal or if Roe v. Wade is overruled. An injunction merely prevents the

named defendants from initiating criminal charges while the court's injunction remains in effect. It does not confer immunity or preemptive pardons on those who violate the statute, and it does not prevent government officials from prosecuting and punishing individuals after the injunction has been dissolved.

(12) The federal district-court ruling that enjoined the enforcement of the Ohio Human Rights and Heartbeat Protection Act does not bind the state judiciary; it does not bind nonparties to the lawsuit; and it does not bind private citizens, who are not even subject to the Fourteenth Amendment, let alone the judiciary's purported interpretations of it. See Civil Rights Cases, 109 U.S. 3 (1883).

(13) Abortion after fetal heartbeat therefore remains a criminal offense under Ohio law, even though a federal district court has temporarily enjoined some government officials from prosecuting and punishing abortion providers who violate the Ohio Human Rights and Heartbeat Protection Act. Abortion providers who kill unborn children after a fetal heartbeat can be detected, and any individual who aids or abets a post-heartbeat abortion in Ohio, remain criminals and felons under Ohio law—even if they are not currently being prosecuted or punished for their criminal acts—and they should be treated and ostracized as such.

(14) Private citizens should continue to regard post-heartbeat abortions and acts that aid and abet post-heartbeat abortions as criminal acts under Ohio law, even though a federal district court has temporarily enjoined government officials from imposing criminal punishment on those who violate the Ohio Human Rights and Heartbeat Protection Act, and private citizens should continue regarding those who perform or assist post-heartbeat abortions as criminals who will be punished for their criminal acts as soon as the Supreme Court overrules Roe v. Wade, 410 U.S. 113 (1973).

(15) The city council of Lebanon finds it necessary to supplement the Ohio Human Rights and Heartbeat Protection Act with this ordinance, which will ensure that abortion at all stages of pregnancy will be regarded as an unlawful act in Lebanon, and that the state's criminal prohibitions on post-heartbeat abortion are enforced to the maximum possible extent.

## B. DECLARATIONS

(1) We declare Lebanon, Ohio to be a Sanctuary City for the Unborn.

(2) We declare that abortion at all times and at all stages of pregnancy is an unlawful act if performed in Lebanon, Ohio, unless the abortion was in response to a life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that, as certified by a physician, places the woman in danger of death or a serious risk of substantial impairment of a major bodily function unless an abortion is performed.

(3) We declare abortion-inducing drugs to be contraband, and we declare the possession of abortion-inducing drugs within city limits to be an unlawful act.

(4) We also declare that abortion after fetal heartbeat remains a criminal act under section 2919.195 of the Ohio Revised Code, unless the abortion is needed to prevent the death of the pregnant woman or to prevent a serious risk of the substantial and irreversible impairment of a major bodily function.

(5) We declare that abortion after fetal heartbeat will remain a criminal act under state law until the legislature repeals section 2919.195 of the Ohio Revised Code, regardless of whether a court has enjoined government officials from prosecuting or punishing abortion providers who violate the Ohio Human Rights and Heartbeat Protection Act.

(6) We declare that the Ohio Human Rights and Heartbeat Protection Act remains enforceable against any person who is not a named party to a court ruling that has declared the statute unconstitutional or enjoined government officials from enforcing it.

(7) We declare that the Ohio Human Rights and Heartbeat Protection Act remains enforceable by any government official who has not been enjoined by a court from enforcing it.

(8) We declare that the Ohio Human Rights and Heartbeat Protection Act remains enforceable against any person who lacks third-party standing to assert the constitutional rights of women seeking abortions, such as individuals who aid or abet abortions by providing financial assistance, transportation to an abortion clinic, or other forms of logistical support, including employers and insurance companies who pay for abortions, and we urge district attorneys throughout the state of Ohio to prosecute these individuals under the Ohio Human Rights and Heartbeat Protection Act and the accomplice-liability provisions in section 2923.03 of the Ohio Revised Code.

(9) We declare that the Ohio Human Rights and Heartbeat Protection Act remains fully enforceable against any person whose criminal prosecution will not result in an "undue burden" on women seeking abortions, such as individuals who aid or abet abortions by providing financial assistance, transportation to an abortion clinic, or other forms of logistical support, including employers and insurance companies who pay for abortions, and we urge district attorneys throughout the state of Ohio to criminally prosecute these individuals under the Ohio Human Rights and Heartbeat Protection Act and the accomplice-liability provisions in section 2923.03 of the Ohio Revised Code.

(10) We declare that all individuals who violate the Ohio Human Rights and Heartbeat Protection Act, and all individuals who aid or abet violations of post-heartbeat abortion, are criminals, regardless of whether a court has enjoined government officials from punishing these individuals for their crimes.

(11) We declare that any abortion provider or other individual who violates the Ohio Human Rights and Heartbeat Protection Act can be prosecuted for their crimes as soon as the injunction preventing the enforcement of that statute is vacated on appeal or in response to a Supreme Court ruling that overrules Roe v. Wade, 410 U.S. 113 (1973), as long as the six-year statute of limitations for felony prosecutions has not expired.

(12) We urge district attorneys throughout the state of Ohio to announce that they will prosecute every person who has violated the Ohio Human Rights and Heartbeat Protection Act, and every person who has aided or abetted a violation of the Ohio Human Rights and Heartbeat Protection Act, as soon as any injunction against the enforcement of that law is vacated on appeal or in response to a Supreme Court ruling that overrules Roe v. Wade, 410 U.S. 113 (1973), to the extent allowed by the six-year statute of limitations.

(13) We urge all residents of Lebanon and the state of Ohio to regard anyone who performs or assists a post-heartbeat abortion as criminals, consistent with the law of Ohio, and to report these criminal activities to district attorneys for future prosecution.

## C.  AMENDMENTS TO CITY CODE

The Lebanon Code of Ordinances is amended by adding sections 509.09 and 509.10 to read as follows:

Sec. 509.09. Abortion.

(A) It shall be unlawful for any person to procure or perform an abortion of any type and at any stage of pregnancy in the city of Lebanon, Ohio.

(B) It shall be unlawful for any person to knowingly aid or abet an abortion that occurs in the city of Lebanon, Ohio. This section does not prohibit referring a patient to have an abortion which takes place outside the city limits of Lebanon, Ohio. The prohibition in this section includes, but is not limited to, the following acts:

(1) Knowingly providing transportation to or from an abortion provider;

(2) Giving instructions over the telephone, the internet, or any other medium of communication regarding self-administered abortion;

(3) Providing money with the knowledge that it will be used to pay for an abortion or the costs associated with procuring an abortion;

(4) Providing "abortion doula" services; and

(5) Coercing a pregnant mother to have an abortion against her will. (C) It shall be an affirmative defense to the unlawful acts described in Subsections (A) and (B) if the abortion was in response to a life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that, ascertified by a physician, places the woman in danger of death or a serious risk of substantial impairment of a major bodily function unless an abortion is performed. The defendant shall have the burden of proving this affirmative defense by a preponderance of the evidence.

(D) It shall be unlawful for any person to possess or distribute abortion-inducing drugs in the city of Lebanon, Ohio.

(E) No provision of this section may be construed to prohibit any action which occurs outside of the jurisdiction of the city of Lebanon, Ohio.

(F) No provision of this section may be construed to prohibit any conduct protected by the First Amendment of the U.S. Constitution, as made applicable to state and local governments through the Supreme Court's interpretation of the Fourteenth Amendment, or by Article 1, Section 11 of the Ohio Constitution.

(G) Under no circumstance may the mother of the unborn child that has been aborted, or the pregnant woman who seeks to abort her unborn child, be subject to prosecution or penalty under this section.

(H) For purposes of this section, the following definitions shall apply:

(1) "Abortion" means the act of using or prescribing an instrument, a drug, a medicine, or any other substance, device, or means with the intent to cause the death of an unborn child of a woman known to be pregnant. The term does not include birth-control devices or oral contraceptives, and it does not include Plan B, morning-after pills, or emergency contraception. An act is not an abortion if the act is done with the intent to:

(a) save the life or preserve the health of an unborn child;

(b) remove a dead, unborn child whose death was caused by accidental miscarriage; or

(c) remove an ectopic pregnancy.

(2) "Unborn child" means a natural person from the moment of conception who has not yet left the womb.

(3) "Abortion-inducing drugs" includes mifepristone, misoprostol, and any drug or medication that is used to terminate the life of an unborn child. The term does not include birth-control devices or oral contraceptives, and it does not include Plan B, morning-after pills, or emergency contraception.

(l) Mindful of Leavitt v. Jane L., 518 U.S. 137 (1996), in which in the context of determining the severability of a state statute regulating abortion the United States Supreme Court held that an explicit statement of legislative intent is controlling, the provisions and applications of this section shall be severable as follows:

(1) It is the intent of the city council that every provision, subsection, sentence, clause, phrase, or word in this section, and every application of the provisions in this section, are severable from each other. If any

application of any provision in this section to any person, group of persons, or circumstances is found by a court to be invalid or unconstitutional, then the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected. All constitutionally valid applications of this section shall be severed from any applications that a court finds to be invalid, leaving the valid applications in force, because it is the city council's intent and prioritythat the valid applications be allowed to stand alone. Even if a reviewing court finds a provision of this section to impose an undue burden in a largeor substantial fraction of relevant cases, the applications that do not present an undue burden shall be severed from the remaining applicationsand shall remain in force, and shall be treated as if the city council had enacted an ordinance limited to the persons, group of persons, or circumstances for which the section's application do not present an undue burden. The city council further declares that it would have enacted this section, and each provision, section, subsection, sentence, clause, phrase, or word, and all constitutional applications of this section, irrespective of the fact that any provision, section, subsection, sentence, clause, phrase, or word, or applications of this section were to be declaredunconstitutional or to represent an undue burden.

(2) If any court declares or finds a provision in this section facially unconstitutional, when there are discrete applications of that provision thatcan be enforced against a person, group of persons, or circumstances without violating the Constitution, then those applications shall be severedfrom all remaining applications of the provision, and the provision shall be interpreted as if the city council had enacted a provision limited to the persons, group of persons, or circumstances for which the provision's application will not violate the Constitution.

(3) If any provision of this section is found by any court to be unconstitutionally vague, then the applications of that provision that do notpresent constitutional vagueness problems shall be severed and remain inforce, consistent with the declarations of the city council's intent in Subsections (I)(1) and (I)(2).

(4) No court may decline to enforce the severability requirements in Subsections (I)(1), (I)(2), and (I)(3) on the ground that severance would "rewrite" the ordinance or involve the court in legislative or lawmaking activity. A court that declines to enforce or enjoins a locality or governmentofficial from enforcing a subset of an ordinance's applications is never "rewriting" an ordinance, as the ordinance continues to say exactly what it said before. A judicial injunction or declaration of unconstitutionality is nothing more than a non-enforcement edict that can always be vacated by

later courts if they have a different understanding of what the Constitution requires; it is not a formal amendment of the language in a statute or ordinance. A judicial injunction or declaration of unconstitutionality no more "rewrites" an ordinance than a decision by an executive official not to enforce a duly enacted statute or ordinance in a limited and defined set of circumstances.

(5) If any federal or state court ignores or declines to enforce the requirements of Subsections (I)(1), (I)(2), (I)(3), or (I)(4), or holds a provision of this section invalid or unconstitutional on its face after failing to enforce the severability requirements of Subsections (I)(1), (I)(2), and (I)(3), for any reason whatsoever, then the Mayor shall hold delegated authority to issue a saving construction of this section that avoids the constitutional problems or other problems identified by the federal or state court, while enforcing the provisions of this section to the maximum possible extent. The saving construction issued by the Mayor shall carry the same force of law as an ordinance; it shall represent the authoritative construction of this section in both federal and state judicial proceedings; and it shall remain in effect until the court ruling that declares invalid or enjoins the enforcement of the original provision in this section is overruled, vacated, or reversed.

(6) The Mayor must issue the saving construction described in Subsection (I)(5) within 20 days after a judicial ruling that declares invalid or enjoins the enforcement of a provision of this section after failing to enforce the severability requirements of Subsections (I)(1), (I)(2), and (I)(3). If the Mayor fails to issue the saving construction required by Subsections (I)(5) within 20 days after a judicial ruling that declares invalid or enjoins the enforcement of a provision of this ordinance after failing to enforce the severability requirements of Subsections (I)(1), (I)(2), and (I)(3), or if the Mayor's saving construction fails to enforce the provisions of the ordinance to the maximum possible extent permitted by the Constitution or other superseding legal requirements, as construed by the federal or state judiciaries, then any person may petition for a writ of mandamus requiring the Mayor to issue the saving construction described in Subsection (I)(5).

(J) Whoever violates this section is guilty of a misdemeanor in the first degree.

Sec. 509.10. Abortions Performed in Violation of Ohio Law.

(A) It is the policy of the city of Lebanon to ensure that the Ohio abortion laws are enforced to the maximum possible extent consistent with the Constitution and existing Supreme Court doctrine.

(B) Except as provided by subsection (D), it shall be unlawful for any person to perform an abortion in violation of any statute enacted by the Ohio legislature, including section 2919.195 of the Ohio Revised Statutes.

(C) Except as provided by subsection (D), it shall be unlawful for any person to knowingly aid or abet an abortion performed in violation of any statute enacted by the Ohio legislature, including section 2919.195 of the Ohio Revised Statutes.
The prohibition in this subsection includes, but is not limited to:

> (1) Knowingly providing transportation to or from an abortion provider;
>
> (2) Giving instructions over the telephone, the internet, or any other medium of communication regarding self-administered abortion;
>
> (3) Providing money with the knowledge that it will be used to pay for an abortion or the costs associated with procuring an abortion;
>
> (4) Providing "abortion doula" services;
>
> (5) Coercing a pregnant mother to have an abortion against her will; and
>
> (6) Engaging in conduct that makes one an accomplice to abortion under section 2923.03 of the Ohio Revised Code.

This subsection may not be construed to impose civil or criminal liability on any speech or conduct protected by the First Amendment of the United States Constitution, as made applicable to the states through the United States Supreme Court's interpretation of the Fourteenth Amendment of the United States Constitution, or by Article 1, Section 11 of the Ohio Constitution.

(D) Until the Supreme Court of the United States overrules Roe v. Wade, 410 U.S. 113 (1973), or Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 874 (1992), the prohibitions in subsections (B) and (C) may be enforced only against:

> (1) Persons who lack third-party standing to assert the rights of women seeking an abortion under the tests for third-party standing established by the Supreme Court of the United States; or
>
> (2) Persons for whom prosecution and punishment will not impose an undue burden on women seeking abortions.

(E) A person who violates this section may assert an affirmative defense if:

> (1) the person has standing to assert the third-party rights of a woman or group of women seeking an abortion under the tests for third-party standing established by the Supreme Court of the United States; and
>
> (2) the person demonstrates that his prosecution or punishment will impose an undue burden on that woman or that group of women seeking

an abortion. A defendant does not establish an "undue burden" under this subsection merely by demonstrating that the imposition of civil or criminal liability will prevent women from obtaining support or assistance, financialor otherwise, from others in their effort to obtain an abortion;

(F) The affirmative defense under Subsection (e) is not available if the United States Supreme Court overrules Roe v. Wade, 410 U.S. 113 (1973), or PlannedParenthood v. Casey, 505 U.S. 833 (1992).

(G) Nothing in this section shall in any way limit or preclude a defendant from asserting his or her own constitutional rights as a defense to civil or criminal liability, and a defendant is not liable under this section for any exercise of stateor federal constitutional rights that belong to the defendant personally.

(H) Under no circumstance may the woman upon whom the unlawful abortion was performed, or the pregnant woman who seeks to abort her unborn child inviolation of Ohio law, be subject to prosecution or penalty under this section.

(l) Mindful of Leavitt v. Jane L., 518 U.S. 137 (1996), in which in the context of determining the severability of a state statute regulating abortion the United States Supreme Court held that an explicit statement of legislative intent is controlling, the provisions and applications of this section shall be severable asfollows:

   (1) It is the intent of the city council that every provision, subsection, sentence, clause, phrase, or word in this section, and every application of the provisions in this section, are severable from each other. If any application of any provision in this section to any person, group of persons, or circumstances is found by a court to be invalid or unconstitutional, then the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected. All constitutionally valid applications of this section shall be severed from any applications that a court finds to be invalid, leaving the valid applications in force, because it is the city council's intent and prioritythat the valid applications be allowed to stand alone. Even if a reviewing court finds a provision of this section to impose an undue burden in a largeor substantial fraction of relevant cases, the applications that do not present an undue burden shall be severed from the remaining applicationsand shall remain in force, and shall be treated as if the city council had enacted an ordinance limited to the persons, group of persons, or circumstances for which the section's application do not present an undue burden. The city council further declares that it would have enacted this section, and each provision, section, subsection, sentence, clause, phrase, or word, and all constitutional applications of this section, irrespective of the fact that any provision, section, subsection, sentence,

clause, phrase, or word, or applications of this section were to be declared unconstitutional or to represent an undue burden.

(2) If any court declares or finds a provision in this section facially unconstitutional, when there are discrete applications of that provision that can be enforced against a person, group of persons, or circumstances without violating the Constitution, then those applications shall be severed from all remaining applications of the provision, and the provision shall be interpreted as if the city council had enacted a provision limited to the persons, group of persons, or circumstances for which the provision's application will not violate the Constitution.

(3) If any provision of this section is found by any court to be unconstitutionally vague, then the applications of that provision that do not present constitutional vagueness problems shall be severed and remain in force, consistent with the declarations of the city council's intent in Subsections (I)(1) and (I)(2).

(4) No court may decline to enforce the severability requirements in Subsections (I)(1), (I)(2), and (I)(3) on the ground that severance would "rewrite" the ordinance or involve the court in legislative or lawmaking activity. A court that declines to enforce or enjoins a locality or government official from enforcing a subset of an ordinance's applications is never "rewriting" an ordinance, as the ordinance continues to say exactly what it said before. A judicial injunction or declaration of unconstitutionality is nothing more than a non-enforcement edict that can always be vacated by later courts if they have a different understanding of what the Constitution requires; it is not a formal amendment of the language in a statute or ordinance. A judicial injunction or declaration of unconstitutionality no more "rewrites" an ordinance than a decision by an executive official not to enforce a duly enacted statute or ordinance in a limited and defined set of circumstances.

(5) If any federal or state court ignores or declines to enforce the requirements of Subsections (I)(1), (I)(2), (I)(3), or (I)(4), or holds a provision of this section invalid or unconstitutional on its face after failing to enforce the severability requirements of Subsections (I)(1), (I)(2), and (I)(3), for any reason whatsoever, then the Mayor shall hold delegated authority to issue a saving construction of this section that avoids the constitutional problems or other problems identified by the federal or state court, while enforcing the provisions of this section to the maximum possible extent. The saving construction issued by the Mayor shall carry the same force of law as an ordinance; it shall represent the authoritative construction of this section in both federal and state judicial proceedings; and it shall remain in effect until the court ruling that declares invalid or

enjoins the enforcement of the original provision in this section is overruled, vacated, or reversed.

(6) The Mayor must issue the saving construction described in Subsection (I)(5) within 20 days after a judicial ruling that declares invalid or enjoins the enforcement of a provision of this section after failing to enforce the severability requirements of Subsections (I)(1), (I)(2), and (I)(3). If the Mayor fails to issue the saving construction required by Subsections (I)(5) within 20 days after a judicial ruling that declares invalid or enjoins the enforcement of a provision of this ordinance after failing to enforce the severability requirements of Subsections (I)(1), (I)(2), and (I)(3), or if the Mayor's saving construction fails to enforce the provisions of the ordinance to the maximum possible extent permitted by the Constitution or other superseding legal requirements, as construed by the federal or state judiciaries, then any person may petition for a writ of mandamus requiring the Mayor to issue the saving construction described in Subsection (I)(5).

(J) Whoever violates this section is guilty of a misdemeanor in the first degree.

(K) This ordinance is hereby declared to be an emergency measure necessary for the immediate preservation of the public health, safety, morals and welfare of the City of Lebanon, Ohio; and for the further reason that the immediate passage of this ordinance is necessary to preserve the lives of unborn children in Lebanon, Ohio then this ordinance shall take effect immediately upon its adoption.


_____
Mayor

Passed: _____

Attest:

_____
Clerk of Council


| **Sponsors:** | City Manager | City Auditor | City Attorney |
|---|---|---|---|
| Brewer, Messer, Mathews, Monroe, Shafer, Shope | | | |

# HILL DECLARATION
# EXHIBIT B

# Mifeprex (mifepristone) Information

Mifeprex (mifepristone) is used, together with another medication called misoprostol, to end an early pregnancy. FDA first approved Mifeprex in 2000. In 2016, the agency approved a supplemental application for Mifeprex based on data and information submitted by the drug manufacturer. After reviewing the supplemental application, the agency determined that Mifeprex is safe and effective when used to terminate a pregnancy in accordance with the revised labeling. In 2019, FDA approved a generic version of Mifeprex, Mifepristone Tablets, 200 mg.

## FDA-Approved Regimen (2016)

Mifepristone is approved, in a regimen with misoprostol, to end a pregnancy through 70 days gestation (70 days or less since the first day of a woman's last menstrual period). The approved mifepristone dosing regimen is:

- On Day One: 200 mg of Mifeprex taken by mouth
- 24 to 48 hours after taking Mifeprex: 800 mcg of misoprostol taken buccally (in the cheek pouch), at a location appropriate for the patient
- About seven to fourteen days after taking Mifeprex: follow-up with the healthcare provider

## Risk Evaluation and Mitigation Strategy (REMS)

FDA previously approved a REMS for Mifeprex. In 2019, at the same time FDA approved the generic version of Mifeprex, the agency approved a single, shared system REMS for mifepristone products for the medical termination of intrauterine pregnancy through 70 days gestation (the Mifepristone REMS Program). Under the 2019 REMS:

- Mifeprex must be ordered, prescribed and dispensed by or under the supervision of a healthcare provider who prescribes and who meets certain qualifications;
- Healthcare providers who wish to prescribe Mifeprex must complete a Prescriber Agreement Form prior to ordering and dispensing Mifeprex;
- Mifeprex may only be dispensed in clinics, medical offices, and hospitals by or under the supervision of a certified healthcare provider;
- The healthcare provider must obtain a signed Patient Agreement Form before dispensing Mifeprex.

Healthcare providers who prescribe Mifeprex are required under FDA regulations to provide the patient with a copy of the Mifeprex Medication Guide (FDA-approved information for patients).

In 2021 FDA undertook a full review of the Mifepristone REMS Program. Based on that review, FDA has determined that the REMS will include the following elements:

- Mifepristone must be prescribed by or under the supervision of a certified healthcare provider who meets certain qualifications, including signing a Prescriber Agreement Form;
- The healthcare provider must obtain a signed Patient Agreement Form from the patient after counseling and prior to prescribing Mifeprex.
- Pharmacies that dispense mifepristone must be certified.

In accordance with the typical process for REMS modifications, FDA has sent REMS Modification notification letters to the applicants for Mifeprex and the approved generic version of Mifeprex, Mifepristone Tablets, 200 mg. Following receipt of these letters, the applicants prepare proposed REMS modifications and submit them to FDA. Once those submissions are reviewed and approved, the REMS modifications will be effective. The revised REMS document and materials will be available within one day after approval on the FDA website at http://www.accessdata.fda.gov/scripts/cder/rems/index.cfm (http://www.accessdata.fda.gov/scripts/cder/rems/index.cfm).

To learn more, including new information added on Dec. 16, 2021, please see Mifeprex (mifepristone) Questions and Answers (/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifeprex).

---

**Do Not Buy Mifeprex or its Approved Generic Over the Internet**

You should not buy Mifeprex or its approved generic over the Internet because you will bypass important safeguards designed to protect your health.

Mifeprex and its approved generic have special safety restrictions on how it is distributed to the public. Also, drugs purchased from foreign Internet sources are not the FDA-approved versions of the drugs, and they are not subject to FDA-regulated manufacturing controls or FDA inspection of manufacturing facilities.

To learn more about buying drugs safely, please see BeSafeRx: Your Source for Online Pharmacy Information (/drugs/quick-tips-buying-medicines-over-internet/besaferx-your-source-online-pharmacy-information)

---

## Related Information

- Questions and Answers on Mifeprex (/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifeprex)

- Historical Information on Mifepristone (marketed as Mifeprex) (http://wayback.archive-it.org/7993/20161022205309/http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm111334.htm ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)

## Labeling and Regulatory History from Drugs@FDA

Mifeprex (mifepristone)

- Mifepristone (marketed as Mifeprex) Prescribing and Label Information (http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.SearchAction&SearchTerm=mifeprex&SearchType=BasicSearch)
- Mifeprex label, 2016 (http://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf)
- Mifeprex Medication Guide (/media/72923/download)
- Mifeprex (mifepristone) Patient Agreement Form (http://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_Patient_Agreement_Form.pdf)
- Mifeprex (mifepristone) Prescriber Agreement Form (http://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_Prescriber_Agreement_Form.pdf)

Mifepristone Tablets, 200 mg

- Mifepristone Tablets, 200 mg Medication Guide (https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf#page=16)
- Mifepristone Tablets, 200 mg Patient Agreement Form (https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifepristone_2021_05_14_Patient_Agreement_Form.pdf)
- Mifepristone Tablets, 200 mg Prescriber Agreement Form (https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifepristone_2021_05_14_Prescriber_Agreement_Form_GenBioPro_Inc.pdf)

# HILL DECLARATION
# EXHIBIT C

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use MIFEPREX safely and effectively. See full prescribing information for MIFEPREX.**

**MIFEPREX®** (mifepristone) tablets, for oral use
Initial U.S. Approval: 2000

---

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**

*See full prescribing information for complete boxed warning.*
Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following MIFEPREX use.

- **Atypical Presentation of Infection.** Patients with serious bacterial infections and sepsis can present without fever, bacteremia or significant findings on pelvic examination. A high index of suspicion is needed to rule out serious infection and sepsis. (5.1)
- **Bleeding.** Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. (5.2)

MIFEPREX is only available through a restricted program called the mifepristone REMS Program (5.3).
Before prescribing MIFEPREX, inform the patient about these risks. Ensure the patient knows whom to call and what to do if she experiences sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if she experiences abdominal pain or discomfort or general malaise for more than 24 hours after taking misoprostol.
Advise the patient to take the MEDICATION GUIDE with her if she visits an emergency room or another healthcare provider who did not prescribe MIFEPREX, so that provider knows that she is undergoing a medical abortion. (5.1, 5.2)

---

**------------------------------INDICATIONS AND USAGE------------------------------**
MIFEPREX is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. (1)

**--------------------DOSAGE AND ADMINISTRATION--------------------**
- 200 mg MIFEPREX on Day 1, followed 24-48 hours after MIFEPREX dosing by 800 mcg buccal misoprostol. (2.1)
- Instruct the patient what to do if significant adverse reactions occur. (2.2)
- Follow-up is needed to confirm complete termination of pregnancy. (2.3)

**--------------------DOSAGE FORMS AND STRENGTHS--------------------**
Tablets containing 200 mg of mifepristone each, supplied as 1 tablet on one blister card (3)

**------------------------------CONTRAINDICATIONS------------------------------**
- Confirmed/suspected ectopic pregnancy or undiagnosed adnexal mass (4)
- Chronic adrenal failure (4)
- Concurrent long-term corticosteroid therapy (4)
- History of allergy to mifepristone, misoprostol, or other prostaglandins (4)
- Hemorrhagic disorders or concurrent anticoagulant therapy (4)
- Inherited porphyria (4)
- Intrauterine device (IUD) in place (4)

**----------------------WARNINGS AND PRECAUTIONS----------------------**
- Ectopic pregnancy: Exclude before treatment. (5.4)
- Rhesus immunization: Prevention needed as for surgical abortion. (5.5)

**------------------------------ADVERSE REACTIONS------------------------------**
Most common adverse reactions (>15%) are nausea, weakness, fever/chills, vomiting, headache, diarrhea, and dizziness. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact Danco Laboratories, LLC at 1-877-432-7596 or medicaldirector@earlyoptionpill.com or www.earlyoptionpill.com or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch*.**

**------------------------------DRUG INTERACTIONS------------------------------**
- CYP3A4 inducers can lower mifepristone concentrations. (7.1)
- CYP3A4 inhibitors can increase mifepristone concentrations. Use with caution. (7.2)
- CYP3A4 substrate concentrations can be increased. Caution with coadministration of substrates with narrow therapeutic margin. (7.3)

**----------------------USE IN SPECIFIC POPULATIONS----------------------**
- Pregnancy: Risk of fetal malformations in ongoing pregnancy if not terminated is unknown. (8.1)

**See 17 for PATIENT COUNSELING INFORMATION, Medication Guide.**

**Revised: XX/XXXX**

---

**FULL PRESCRIBING INFORMATION: CONTENTS***

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**
**1 INDICATIONS AND USAGE**
**2 DOSAGE AND ADMINISTRATION**
   2.1 Dosing Regimen
   2.2 Patient Management Following Misoprostol Administration
   2.3 Post-treatment Assessment: Day 7 to 14
   2.4 Contact for Consultation
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
   5.1 Infections and Sepsis
   5.2 Uterine Bleeding
   5.3 Mifepristone REMS Program
   5.4 Ectopic Pregnancy
   5.5 Rhesus Immunization
**6 ADVERSE REACTIONS**
   6.1 Clinical Trials Experience
   6.2 Postmarketing Experience
**7 DRUG INTERACTIONS**
   7.1 Drugs that May Reduce MIFEPREX Exposure (Effect of CYP 3A4 Inducers on MIFEPREX)
   7.2 Drugs that May Increase Exposure (Effect of CYP 3A4 Inhibitors on MIFEPREX)
   7.3 Effects of MIFEPREX on Other Drugs (Effect of MIFEPREX on CYP 3A4 Substrates)
**8 USE IN SPECIFIC POPULATIONS**
   8.1 Pregnancy
   8.2 Lactation
   8.4 Pediatric Use
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
   12.1 Mechanism of Action
   12.2 Pharmacodynamics
   12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
   13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
**14 CLINICAL STUDIES**
**16 HOW SUPPLIED/STORAGE AND HANDLING**
**17 PATIENT COUNSELING INFORMATION**

*Sections or subsections omitted from the full prescribing information are not listed.

**FULL PRESCRIBING INFORMATION**

---

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**

**Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following MIFEPREX use. No causal relationship between the use of MIFEPREX and misoprostol and these events has been established.**

- **Atypical Presentation of Infection. Patients with serious bacterial infections (e.g., *Clostridium sordellii*) and sepsis can present without fever, bacteremia, or significant findings on pelvic examination following an abortion. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise. A high index of suspicion is needed to rule out serious infection and sepsis *[see Warnings and Precautions (5.1)]*.**

- **Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. Advise patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding *[see Warnings and Precautions (5.2)]*.**

**Because of the risks of serious complications described above, MIFEPREX is available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS) called the mifepristone REMS Program *[see Warnings and Precautions (5.3)]*.**

**Before prescribing MIFEPREX, inform the patient about the risk of these serious events. Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, if she experiences sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if she experiences abdominal pain or discomfort, or general malaise (including weakness, nausea, vomiting, or diarrhea) for more than 24 hours after taking misoprostol.**

**Advise the patient to take the Medication Guide with her if she visits an emergency room or a healthcare provider who did not prescribe MIFEPREX, so that the provider knows that she is undergoing a medical abortion.**

---

## 1    INDICATIONS AND USAGE

MIFEPREX is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.

## 2    DOSAGE AND ADMINISTRATION

### 2.1  Dosing Regimen

For purposes of this treatment, pregnancy is dated from the first day of the last menstrual period. The duration of pregnancy may be determined from menstrual history and clinical examination. Assess the pregnancy by ultrasonographic scan if the duration of pregnancy is uncertain or if ectopic pregnancy is suspected.

2

Remove any intrauterine device ("IUD") before treatment with MIFEPREX begins [*see Contraindications (4)*].

The dosing regimen for MIFEPREX and misoprostol is:

- MIFEPREX 200 mg orally + misoprostol 800 mcg buccally

  - *Day One:* MIFEPREX Administration
    One 200 mg tablet of MIFEPREX is taken in a single oral dose.

  - *Day Two or Three:* Misoprostol Administration (minimum 24-hour interval between MIFEPREX and misoprostol)
    Four 200 mcg tablets (total dose 800 mcg) of misoprostol are taken by the buccal route.

    Tell the patient to place two 200 mcg misoprostol tablets in each cheek pouch (the area between the cheek and gums) for 30 minutes and then swallow any remnants with water or another liquid (see Figure 1).

    **Figure 1**



**2 pills between cheek and gum on left side + 2 pills between cheek and gum on right side**

Patients taking MIFEPREX must take misoprostol within 24 to 48 hours after taking MIFEPREX. The effectiveness of the regimen may be lower if misoprostol is administered less than 24 hours or more than 48 hours after mifepristone administration.

Because most women will expel the pregnancy within 2 to 24 hours of taking misoprostol *[see Clinical Studies (14)]*, discuss with the patient an appropriate location for her to be when she takes the misoprostol, taking into account that expulsion could begin within 2 hours of administration.

### 2.2  Patient Management Following Misoprostol Administration

During the period immediately following the administration of misoprostol, the patient may need medication for cramps or gastrointestinal symptoms *[see Adverse Reactions (6)]*.

Give the patient:

- Instructions on what to do if significant discomfort, excessive vaginal bleeding or other adverse reactions occur
- A phone number to call if she has questions following the administration of the misoprostol

Reference ID: 4418041

- The name and phone number of the healthcare provider who will be handling emergencies.

## 2.3 Post-treatment Assessment: Day 7 to 14

Patients should follow-up with their healthcare provider approximately 7 to 14 days after the administration of MIFEPREX. This assessment is very important to confirm that complete termination of pregnancy has occurred and to evaluate the degree of bleeding. Termination can be confirmed by medical history, clinical examination, human Chorionic Gonadotropin (hCG) testing, or ultrasonographic scan. Lack of bleeding following treatment usually indicates failure; however, prolonged or heavy bleeding is not proof of a complete abortion.

The existence of debris in the uterus (e.g., if seen on ultrasonography) following the treatment procedure will not necessarily require surgery for its removal.

Women should expect to experience vaginal bleeding or spotting for an average of 9 to 16 days. Women report experiencing heavy bleeding for a median duration of 2 days. Up to 8% of women may experience some type of bleeding for more than 30 days. Persistence of heavy or moderate vaginal bleeding at the time of follow-up, however, could indicate an incomplete abortion.

If complete expulsion has not occurred, but the pregnancy is not ongoing, women may be treated with another dose of misoprostol 800 mcg buccally. There have been rare reports of uterine rupture in women who took MIFEPREX and misoprostol, including women with prior uterine rupture or uterine scar and women who received multiple doses of misoprostol within 24 hours. Women who choose to use a repeat dose of misoprostol should have a follow-up visit with their healthcare provider in approximately 7 days to assess for complete termination.

Surgical evacuation is recommended to manage ongoing pregnancies after medical abortion *[see Use in Specific Populations (8.1)]*. Advise the patient whether you will provide such care or will refer her to another provider as part of counseling prior to prescribing MIFEPREX.

## 2.4 Contact for Consultation

**For consultation 24 hours a day, 7 days a week with an expert in mifepristone, call Danco Laboratories at 1-877-4 Early Option (1-877-432-7596).**

## 3 DOSAGE FORMS AND STRENGTHS

Tablets containing 200 mg of mifepristone each, supplied as 1 tablet on one blister card. MIFEPREX tablets are light yellow, cylindrical, and bi-convex tablets, approximately 11 mm in diameter and imprinted on one side with "MF."

## 4 CONTRAINDICATIONS

- Administration of MIFEPREX and misoprostol for the termination of pregnancy (the "treatment procedure") is contraindicated in patients with any of the following conditions:

  - Confirmed or suspected ectopic pregnancy or undiagnosed adnexal mass (the treatment procedure will not be effective to terminate an ectopic pregnancy) *[see Warnings and Precautions (5.4)]*

  - Chronic adrenal failure (risk of acute renal insufficiency)

  - Concurrent long-term corticosteroid therapy (risk of acute renal insufficiency)

Reference ID: 4418041

- History of allergy to mifepristone, misoprostol, or other prostaglandins (allergic reactions including anaphylaxis, angioedema, rash, hives, and itching have been reported *[see Adverse Reactions (6.2)]*)

- Hemorrhagic disorders or concurrent anticoagulant therapy (risk of heavy bleeding)

- Inherited porphyrias (risk of worsening or of precipitation of attacks)

- Use of MIFEPREX and misoprostol for termination of intrauterine pregnancy is contraindicated in patients with an intrauterine device ("IUD") in place (the IUD might interfere with pregnancy termination). If the IUD is removed, MIFEPREX may be used.

## 5    WARNINGS AND PRECAUTIONS

### 5.1  Infection and Sepsis

As with other types of abortion, cases of serious bacterial infection, including very rare cases of fatal septic shock, have been reported following the use of MIFEPREX *[see Boxed Warning]*. Healthcare providers evaluating a patient who is undergoing a medical abortion should be alert to the possibility of this rare event. A sustained (> 4 hours) fever of 100.4°F or higher, severe abdominal pain, or pelvic tenderness in the days after a medical abortion may be an indication of infection.

A high index of suspicion is needed to rule out sepsis (e.g., from *Clostridium sordellii*) if a patient reports abdominal pain or discomfort or general malaise (including weakness, nausea, vomiting, or diarrhea) more than 24 hours after taking misoprostol. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise. No causal relationship between MIFEPREX and misoprostol use and an increased risk of infection or death has been established. *Clostridium sordellii* infections have also been reported very rarely following childbirth (vaginal delivery and caesarian section), and in other gynecologic and non-gynecologic conditions.

### 5.2  Uterine Bleeding

Uterine bleeding occurs in almost all patients during a medical abortion. Prolonged heavy bleeding (soaking through two thick full-size sanitary pads per hour for two consecutive hours) may be a sign of incomplete abortion or other complications, and prompt medical or surgical intervention may be needed to prevent the development of hypovolemic shock. Counsel patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding following a medical abortion *[see Boxed Warning]*.

Women should expect to experience vaginal bleeding or spotting for an average of 9 to 16 days. Women report experiencing heavy bleeding for a median duration of 2 days. Up to 8% of all subjects may experience some type of bleeding for 30 days or more. In general, the duration of bleeding and spotting increased as the duration of the pregnancy increased.

Decreases in hemoglobin concentration, hematocrit, and red blood cell count may occur in women who bleed heavily.

Excessive uterine bleeding usually requires treatment by uterotonics, vasoconstrictor drugs, surgical uterine evacuation, administration of saline infusions, and/or blood transfusions. Based on data from several large clinical trials, vasoconstrictor drugs were used in 4.3% of all subjects, there was a decrease in hemoglobin of more than 2 g/dL in 5.5% of subjects, and blood transfusions were administered to ≤ 0.1% of subjects. Because heavy bleeding requiring

Reference ID: 4418041

surgical uterine evacuation occurs in about 1% of patients, special care should be given to patients with hemostatic disorders, hypocoagulability, or severe anemia.

## 5.3 Mifepristone REMS Program

MIFEPREX is available only through a restricted program under a REMS called the mifepristone REMS Program, because of the risks of serious complications *[see Warnings and Precautions (5.1, 5.2)].*

Notable requirements of the mifepristone REMS Program include the following:

- Prescribers must be certified with the program by completing the Prescriber Agreement Form.
- Patients must sign a Patient Agreement Form.
- MIFEPREX must be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices and hospitals by or under the supervision of a certified prescriber.

Further information is available at 1-877-4 Early Option (1-877-432-7596).

## 5.4 Ectopic Pregnancy

MIFEPREX is contraindicated in patients with a confirmed or suspected ectopic pregnancy because MIFEPREX is not effective for terminating ectopic pregnancies *[see Contraindications (4)].* Healthcare providers should remain alert to the possibility that a patient who is undergoing a medical abortion could have an undiagnosed ectopic pregnancy because some of the expected symptoms experienced with a medical abortion (abdominal pain, uterine bleeding) may be similar to those of a ruptured ectopic pregnancy. The presence of an ectopic pregnancy may have been missed even if the patient underwent ultrasonography prior to being prescribed MIFEPREX.

Women who became pregnant with an IUD in place should be assessed for ectopic pregnancy.

## 5.5 Rhesus Immunization

The use of MIFEPREX is assumed to require the same preventive measures as those taken prior to and during surgical abortion to prevent rhesus immunization.

## 6    ADVERSE REACTIONS

The following adverse reactions are described in greater detail in other sections:

- Infection and sepsis *[see Warnings and Precautions (5.1)]*
- Uterine bleeding *[see Warnings and Precautions (5.2)]*

## 6.1 Clinical Trials Experience

Because clinical studies are conducted under widely varying conditions, adverse reaction rates observed in the clinical studies of a drug cannot be directly compared to rates in the clinical studies of another drug and may not reflect the rates observed in practice.

Information presented on common adverse reactions relies solely on data from U.S. studies, because rates reported in non-U.S. studies were markedly lower and are not likely generalizable to the U.S. population.  In three U.S. clinical studies totaling 1,248 women through 70 days gestation who used mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally, women reported adverse reactions in diaries and in interviews at the follow-up visit. These studies enrolled generally healthy women of reproductive age without contraindications to mifepristone or misoprostol use according to the MIFEPREX product label.

Reference ID: 4418041

Gestational age was assessed prior to study enrollment using the date of the woman's last menstrual period, clinical evaluation, and/or ultrasound examination.

About 85% of patients report at least one adverse reaction following administration of MIFEPREX and misoprostol, and many can be expected to report more than one such reaction. The most commonly reported adverse reactions (>15%) were nausea, weakness, fever/chills, vomiting, headache, diarrhea, and dizziness (see Table 1). The frequency of adverse reactions varies between studies and may be dependent on many factors, including the patient population and gestational age.

Abdominal pain/cramping is expected in all medical abortion patients and its incidence is not reported in clinical studies. Treatment with MIFEPREX and misoprostol is designed to induce uterine bleeding and cramping to cause termination of an intrauterine pregnancy. Uterine bleeding and cramping are expected consequences of the action of MIFEPREX and misoprostol as used in the treatment procedure. Most women can expect bleeding more heavily than they do during a heavy menstrual period *[see Warnings and Precautions (5.2)]*.

Table 1 lists the adverse reactions reported in U.S. clinical studies with incidence >15% of women.

**Table 1**
**Adverse Reactions Reported in Women Following Administration of Mifepristone (oral) and Misoprostol (buccal) in U.S. Clinical Studies**

| Adverse Reaction | # U.S. studies | Number of Evaluable Women | Range of frequency (%) | Upper Gestational Age of Studies Reporting Outcome |
|---|---|---|---|---|
| Nausea | 3 | 1,248 | 51-75% | 70 days |
| Weakness | 2 | 630 | 55-58% | 63 days |
| Fever/chills | 1 | 414 | 48% | 63 days |
| Vomiting | 3 | 1,248 | 37-48% | 70 days |
| Headache | 2 | 630 | 41-44% | 63 days |
| Diarrhea | 3 | 1,248 | 18-43% | 70 days |
| Dizziness | 2 | 630 | 39-41% | 63 days |

One study provided gestational-age stratified adverse reaction rates for women who were 57-63 and 64-70 days; there was little difference in frequency of the reported common adverse reactions by gestational age.

Information on serious adverse reactions was reported in six U.S. and four non-U.S. clinical studies, totaling 30,966 women through 70 days gestation who used mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally. Serious adverse reaction rates were similar between U.S. and non-U.S. studies, so rates from both U.S. and non-U.S. studies are presented. In the U.S. studies, one studied women through 56 days gestation, four through 63 days gestation, and one through 70 days gestation, while in the non-U.S. studies, two studied women through 63 days gestation, and two through 70 days gestation. Serious adverse reactions were reported in <0.5% of women. Information from the U.S. and non-U.S. studies is presented in Table 2.

Reference ID: 4418041

**Table 2**
**Serious Adverse Reactions Reported in Women Following Administration of Mifepristone (oral) and Misoprostol (buccal) in U.S. and Non-U.S. Clinical Studies**

| Adverse Reaction | U.S. | | | Non-U.S. | | |
|---|---|---|---|---|---|---|
| | # of studies | Number of Evaluable Women | Range of frequency (%) | # of studies | Number of Evaluable Women | Range of frequency (%) |
| Transfusion | 4 | 17,774 | 0.03-0.5% | 3 | 12,134 | 0-0.1% |
| Sepsis | 1 | 629 | 0.2% | 1 | 11,155 | <0.01%* |
| ER visit | 2 | 1,043 | 2.9-4.6% | 1 | 95 | 0 |
| Hospitalization Related to Medical Abortion | 3 | 14,339 | 0.04-0.6% | 3 | 1,286 | 0-0.7% |
| Infection without sepsis | 1 | 216 | 0 | 1 | 11,155 | 0.2% |
| Hemorrhage | NR | NR | NR | 1 | 11,155 | 0.1% |

NR= Not reported
* This outcome represents a single patient who experienced death related to sepsis.

### 6.2 Postmarketing Experience

The following adverse reactions have been identified during postapproval use of MIFEPREX and misoprostol. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

*Infections and infestations:* post-abortal infection (including endometritis, endomyometritis, parametritis, pelvic infection, pelvic inflammatory disease, salpingitis)
*Blood and the lymphatic system disorders:* anemia
*Immune system disorders:* allergic reaction (including anaphylaxis, angioedema, hives, rash, itching)
*Psychiatric disorders:* anxiety
*Cardiac disorders:* tachycardia (including racing pulse, heart palpitations, heart pounding)
*Vascular disorders:* syncope, fainting, loss of consciousness, hypotension (including orthostatic), light-headedness
*Respiratory, thoracic and mediastinal disorders:* shortness of breath
*Gastrointestinal disorders:* dyspepsia
*Musculoskeletal, connective tissue and bone disorders:* back pain, leg pain
*Reproductive system and breast disorders:* uterine rupture, ruptured ectopic pregnancy, hematometra, leukorrhea
*General disorders and administration site conditions:* pain

## 7 DRUG INTERACTIONS

### 7.1 Drugs that May Reduce MIFEPREX Exposure (Effect of CYP 3A4 Inducers on MIFEPREX)

CYP450 3A4 is primarily responsible for the metabolism of mifepristone. CYP3A4 inducers such as rifampin, dexamethasone, St. John's Wort, and certain anticonvulsants (such as phenytoin, phenobarbital, carbamazepine) may induce mifepristone metabolism (lowering serum concentrations of mifepristone). Whether this action has an impact on the efficacy of the dose

Reference ID: 4418041

regimen is unknown.   Refer to the follow-up assessment *[see Dosage and Administration (2.3 )]* to verify that treatment has been successful.

### 7.2 Drugs that May Increase MIFEPREX Exposure (Effect of CYP 3A4 Inhibitors on MIFEPREX)

Although specific drug or food interactions with mifepristone have not been studied, on the basis of this drug's metabolism by CYP 3A4, it is possible that ketoconazole, itraconazole, erythromycin, and grapefruit juice may inhibit its metabolism (increasing serum concentrations of mifepristone). MIFEPREX should be used with caution in patients currently or recently treated with CYP 3A4 inhibitors.

### 7.3 Effects of MIFEPREX on Other Drugs (Effect of MIFEPREX on CYP 3A4 Substrates)

Based on *in vitro* inhibition information, coadministration of mifepristone may lead to an increase in serum concentrations of drugs that are CYP 3A4 substrates. Due to the slow elimination of mifepristone from the body, such interaction may be observed for a prolonged period after its administration. Therefore, caution should be exercised when mifepristone is administered with drugs that are CYP 3A4 substrates and have narrow therapeutic range.

## 8     USE IN SPECIFIC POPULATIONS

### 8.1 Pregnancy

Risk Summary

Mifepristone is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.  Risks to pregnant women are discussed throughout the labeling.

Refer to misoprostol labeling for risks to pregnant women with the use of misoprostol.

The risk of adverse developmental outcomes with a continued pregnancy after a failed pregnancy termination with MIFEPREX in a regimen with misoprostol is unknown; however, the process of a failed pregnancy termination could disrupt normal embryo-fetal development and result in adverse developmental effects.  Birth defects have been reported with a continued pregnancy after a failed pregnancy termination with MIFEPREX in a regimen with misoprostol. In animal reproduction studies, increased fetal losses were observed in mice, rats, and rabbits and skull deformities were observed in rabbits with administration of mifepristone at doses lower than the human exposure level based on body surface area.

Data

*Animal Data*

In teratology studies in mice, rats and rabbits at doses of 0.25 to 4.0 mg/kg (less than 1/100 to approximately 1/3 the human exposure based on body surface area), because of the antiprogestational activity of mifepristone,fetal losses were much higher than in control animals. Skull deformities were detected in rabbit studies at approximately 1/6 the human exposure, although no teratogenic effects of  mifepristone have been observed to date in rats or mice. These deformities were most likely due to the mechanical effects of uterine contractions resulting from inhibition of progesterone action.

### 8.2 Lactation

MIFEPREX is present in human milk.  Limited data demonstrate undetectable to low levels of the drug in human milk with the relative (weight-adjusted) infant dose 0.5% or less as compared to maternal dosing. There is no information on the effects of MIFEPREX in a regimen with

Reference ID: 4418041

misoprostol in a breastfed infant or on milk production. Refer to misoprostol labeling for lactation information with the use of misoprostol. The developmental and health benefits of breast-feeding should be considered along with any potential adverse effects on the breast-fed child from MIFEPREX in a regimen with misoprostol.

### 8.4 Pediatric Use

Safety and efficacy of MIFEPREX have been established in pregnant females. Data from a clinical study of MIFEPREX that included a subset of 322 females under age 17 demonstrated a safety and efficacy profile similar to that observed in adults.

## 10 OVERDOSAGE

No serious adverse reactions were reported in tolerance studies in healthy non-pregnant female and healthy male subjects where mifepristone was administered in single doses greater than 1800 mg (ninefold the recommended dose for medical abortion). If a patient ingests a massive overdose, she should be observed closely for signs of adrenal failure.

## 11 DESCRIPTION

MIFEPREX tablets each contain 200 mg of mifepristone, a synthetic steroid with antiprogestational effects. The tablets are light yellow in color, cylindrical, and bi-convex, and are intended for oral administration only. The tablets include the inactive ingredients colloidal silica anhydrous, corn starch, povidone, microcrystalline cellulose, and magnesium stearate.

Mifepristone is a substituted 19-nor steroid compound chemically designated as 11ß-[*p*-(Dimethylamino)phenyl]-17ß-hydroxy-17-(1-propynyl)estra-4,9-dien-3-one. Its empirical formula is $C_{29}H_{35}NO_2$. Its structural formula is:



The compound is a yellow powder with a molecular weight of 429.6 and a melting point of 192-196°C. It is very soluble in methanol, chloroform and acetone and poorly soluble in water, hexane and isopropyl ether.

## 12 CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

The anti-progestational activity of mifepristone results from competitive interaction with progesterone at progesterone-receptor sites. Based on studies with various oral doses in several animal species (mouse, rat, rabbit, and monkey), the compound inhibits the activity of endogenous or exogenous progesterone, resulting in effects on the uterus and cervix that, when combined with misoprostol, result in termination of an intrauterine pregnancy.

Reference ID: 4418041

During pregnancy, the compound sensitizes the myometrium to the contraction-inducing activity of prostaglandins.

## 12.2 Pharmacodynamics

Use of MIFEPREX in a regimen with misoprostol disrupts pregnancy by causing decidual necrosis, myometrial contractions, and cervical softening, leading to the expulsion of the products of conception.

Doses of 1 mg/kg or greater of mifepristone have been shown to antagonize the endometrial and myometrial effects of progesterone in women.

Antiglucocorticoid and antiandrogenic activity:  Mifepristone also exhibits antiglucocorticoid and weak antiandrogenic activity.  The activity of the glucocorticoid dexamethasone in rats was inhibited following doses of 10 to 25 mg/kg of mifepristone. Doses of 4.5 mg/kg or greater in human beings resulted in a compensatory elevation of adrenocorticotropic hormone (ACTH) and cortisol. Antiandrogenic activity was observed in rats following repeated administration of doses from 10 to 100 mg/kg.

## 12.3 Pharmacokinetics

Mifepristone is rapidly absorbed after oral ingestion with non-linear pharmacokinetics for Cmax after single oral doses of 200 mg and 600 mg in healthy subjects.

<u>Absorption</u>

The absolute bioavailability of a 20 mg mifepristone oral dose in women of childbearing age is 69%. Following oral administration of a single dose of 600 mg, mifepristone is rapidly absorbed, with a peak plasma concentration of 1.98 ± 1.0 mg/L occurring approximately 90 minutes after ingestion.

Following oral administration of a single dose of 200 mg in healthy men (n=8), mean Cmax was 1.77 ± 0.7 mg/L occurring approximately 45 minutes after ingestion. Mean $AUC_{0-\infty}$ was 25.8 ± 6.2 mg*hr/L.

<u>Distribution</u>

Mifepristone is 98% bound to plasma proteins, albumin, and $\alpha_1$-acid glycoprotein. Binding to the latter protein is saturable, and the drug displays nonlinear kinetics with respect to plasma concentration and clearance.

<u>Elimination</u>

Following a distribution phase, elimination of mifepristone is slow at first (50% eliminated between 12 and 72 hours) and then becomes more rapid with a terminal elimination half-life of 18 hours.

*Metabolism*

Metabolism of mifepristone is primarily via pathways involving N-demethylation and terminal hydroxylation of the 17-propynyl chain. *In vitro* studies have shown that CYP450 3A4 is primarily responsible for the metabolism. The three major metabolites identified in humans are: (1) RU 42 633, the most widely found in plasma, is the N-monodemethylated metabolite; (2) RU 42 848, which results from the loss of two methyl groups from the 4-dimethylaminophenyl in position 11ß; and (3) RU 42 698, which results from terminal hydroxylation of the 17-propynyl chain.

*Excretion*

By 11 days after a 600 mg dose of tritiated compound, 83% of the drug has been accounted for by the feces and 9% by the urine. Serum concentrations are undetectable by 11 days.

Reference ID: 4418041

Specific Populations

The effects of age, hepatic disease and renal disease on the safety, efficacy and pharmacokinetics of mifepristone have not been investigated.

## 13  NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Carcinogenesis

No long-term studies to evaluate the carcinogenic potential of mifepristone have been performed.

Mutagenesis

Results from studies conducted *in vitro* and in animals have revealed no genotoxic potential for mifepristone. Among the tests carried out were: Ames test with and without metabolic activation; gene conversion test in *Saccharomyces cerevisiae* D4 cells; forward mutation in *Schizosaccharomyces pompe* P1 cells; induction of unscheduled DNA synthesis in cultured HeLa cells; induction of chromosome aberrations in CHO cells; *in vitro* test for gene mutation in V79 Chinese hamster lung cells; and micronucleus test in mice.

Impairment of Fertility

In rats, administration of  0.3 mg/kg mifepristone per day caused severe disruption of the estrus cycles for the three weeks of the treatment period. Following resumption of the estrus cycle, animals were mated and no effects on reproductive performance  were observed.

## 14  CLINICAL STUDIES

Safety and efficacy data from clinical studies of mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally through 70 days gestation are reported below. Success was defined as the complete expulsion of the products of conception without the need for surgical intervention. The overall rates of success and failure, shown by reason for failure based on 22 worldwide clinical studies (including 7 U.S. studies) appear in Table 3.

The demographics of women who participated in the U.S. clinical studies varied depending on study location and represent the racial and ethnic variety of American females.  Females of all reproductive ages were represented, including females less than 18 and more than 40 years of age; most were 27 years or younger.

Reference ID: 4418041

**Table 3**
**Outcome Following Treatment with Mifepristone (oral) and Misoprostol (buccal)**
**Through 70 Days Gestation**

|  | U.S. Trials | Non-U.S. Trials |
|---|---|---|
| **N** | 16,794 | 18,425 |
| **Complete Medical Abortion** | 97.4% | 96.2% |
| **Surgical Intervention*** | 2.6% | 3.8% |
| **Ongoing Pregnancy**** | 0.7% | 0.9% |
| * Reasons for surgical intervention include ongoing pregnancy, medical necessity, persistent or heavy bleeding after treatment, patient request, or incomplete expulsion.<br>** Ongoing pregnancy is a subcategory of surgical intervention, indicating the percent of women who have surgical intervention due to an ongoing pregnancy. | | |

The results for clinical studies that reported outcomes, including failure rates for ongoing pregnancy, by gestational age are presented in Table 4.

**Table 4**
**Outcome by Gestational Age Following Treatment with Mifepristone and**
**Misoprostol (buccal) for U.S. and Non-U.S. Clinical Studies**

|  | ≤49 days | | | 50-56 days | | | 57-63 days | | | 64-70 days | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies |
| **Complete medical abortion** | 12,046 | 98.1 | 10 | 3,941 | 96.8 | 7 | 2,294 | 94.7 | 9 | 479 | 92.7 | 4 |
| **Surgical intervention for ongoing pregnancy** | 10,272 | 0.3 | 6 | 3,788 | 0.8 | 6 | 2,211 | 2 | 8 | 453 | 3.1 | 3 |

One clinical study asked subjects through 70 days gestation to estimate when they expelled the pregnancy, with 70% providing data. Of these, 23-38% reported expulsion within 3 hours and over 90% within 24 hours of using misoprostol.

## 16   HOW SUPPLIED/STORAGE AND HANDLING

MIFEPREX is only available through a restricted program called the mifepristone REMS Program *[see Warnings and Precautions (5.3)]*.

MIFEPREX is supplied as light yellow, cylindrical, and bi-convex tablets imprinted on one side with "MF." Each tablet contains 200 mg of mifepristone. One tablet is individually blistered on one blister card that is packaged in an individual package (National Drug Code 64875-001-01).

Store at 25°C (77°F); excursions permitted to 15 to 30°C (59 to 86°F) [see USP Controlled Room Temperature].

Reference ID: 4418041

## 17   PATIENT COUNSELING INFORMATION

Advise the patient to read the FDA-approved patient labeling (Medication Guide), included with each package of MIFEPREX. Additional copies of the Medication Guide are available by contacting Danco Laboratories at 1-877-4 Early Option (1-877-432-7596) or from www.earlyoptionpill.com.

Serious Infections and Bleeding

- Inform the patient that uterine bleeding and uterine cramping will occur [*see Warnings and Precautions (5.2)*].

- Advise the patient that serious and sometimes fatal infections and bleeding can occur very rarely [*see Warnings and Precautions (5.1, 5.2)*].

- MIFEPREX is only available through a restricted program called the mifepristone REMS Program [*see Warnings and Precautions (5.3)*].  Under the mifepristone REMS Program:

  - Patients must sign a Patient Agreement Form.

  - MIFEPREX is only available in clinics, medical offices and hospitals and not through retail pharmacies.

Provider Contacts and Actions in Case of Complications

- Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, or if she experiences complications including prolonged heavy bleeding, severe abdominal pain, or sustained fever *[see Boxed Warning]*.

- Advise the patient to take the Medication Guide with her if she visits an emergency room or another healthcare provider who did not prescribe MIFEPREX, so that provider will be aware that the patient is undergoing a medical abortion with MIFEPREX.

Compliance with Treatment Schedule and Follow-up Assessment

- Advise the patient that it is necessary to complete the treatment schedule, including a follow-up assessment approximately 7 to14 days after taking MIFEPREX *[see Dosage and Administration (2.3)]*.

- Explain that

  - prolonged heavy vaginal bleeding is not proof of a complete abortion,

  - if the treatment fails and the pregnancy continues, the risk of fetal malformation is unknown,

  - it is recommended that ongoing pregnancy be managed by surgical termination *[see Dosage and Administration (2.3)]*.  Advise the patient whether you will provide such care or will refer her to another provider.

Subsequent Fertility

- Inform the patient that another pregnancy can occur following medical abortion and before resumption of normal menses.

- Inform the patient that contraception can be initiated as soon as pregnancy expulsion has been confirmed, or before she resumes sexual intercourse.

MIFEPREX is a registered trademark of Danco Laboratories, LLC.

Manufactured for:
*Danco Laboratories, LLC*
P.O. Box 4816
New York, NY 10185
1-877-4 Early Option (1-877-432-7596)
www.earlyoptionpill.com

XX/XXXX

Reference ID: 4418041

**MEDICATION GUIDE**

**Mifeprex** (MIF-eh-prex) (mifepristone) tablets, for oral use

Read this information carefully before taking Mifeprex and misoprostol. It will help you understand how the treatment works. This Medication Guide does not take the place of talking with your healthcare provider.

**What is the most important information I should know about Mifeprex?**

**What symptoms should I be concerned with?** Although cramping and bleeding are an expected part of ending a pregnancy, rarely, serious and potentially life-threatening bleeding, infections, or other problems can occur following a miscarriage, surgical abortion, medical abortion, or childbirth. Seeking medical attention as soon as possible is needed in these circumstances. Serious infection has resulted in death in a very small number of cases. There is no information that use of Mifeprex and misoprostol caused these deaths. If you have any questions, concerns, or problems, or if you are worried about any side effects or symptoms, you should contact your healthcare provider. You can write down your healthcare provider's telephone number here _____.

**Be sure to contact your healthcare provider promptly if you have any of the following:**

- **Heavy Bleeding.** Contact your healthcare provider right away if you bleed enough to soak through two thick full-size sanitary pads per hour for two consecutive hours or if you are concerned about heavy bleeding. In about 1 out of 100 women, bleeding can be so heavy that it requires a surgical procedure (surgical aspiration or D&C).

- **Abdominal Pain or "Feeling Sick."** If you have abdominal pain or discomfort, or you are "feeling sick," including weakness, nausea, vomiting, or diarrhea, with or without fever, more than 24 hours after taking misoprostol, you should contact your healthcare provider without delay. These symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

- **Fever.** In the days after treatment, if you have a fever of 100.4°F or higher that lasts for more than 4 hours, you should contact your healthcare provider right away. Fever may be a symptom of a serious infection or another problem.

**If you cannot reach your healthcare provider, go to the nearest hospital emergency room. Take this Medication Guide with you.** When you visit an emergency room or a healthcare provider who did not give you your Mifeprex, you should give them your Medication Guide so that they understand that you are having a medical abortion with Mifeprex.

**What to do if you are still pregnant after Mifeprex with misoprostol treatment.** If you are still pregnant, your healthcare provider will talk with you about a surgical procedure to end your pregnancy. In many cases, this surgical procedure can be done in the office/clinic. The chance of birth defects if the pregnancy is not ended is unknown.

**Talk with your healthcare provider.** Before you take Mifeprex, you should read this Medication Guide and you and your healthcare provider should discuss the benefits and risks of your using Mifeprex.

Reference ID: 4418041

**What is Mifeprex?**

**Mifeprex is used in a regimen with another prescription medicine called misoprostol, to end an early pregnancy.** Early pregnancy means it is 70 days (10 weeks) or less since your last menstrual period began. Mifeprex is not approved for ending pregnancies that are further along. Mifeprex blocks a hormone needed for your pregnancy to continue. When you use Mifeprex on Day 1, you also need to take another medicine called misoprostol 24 to 48 hours after you take Mifeprex, to cause the pregnancy to be passed from your uterus.

The pregnancy is likely to be passed from your uterus within 2 to 24 hours after taking Mifeprex and misoprostol.  When the pregnancy is passed from the uterus, you will have bleeding and cramping that will likely be heavier than your usual period. About 2 to 7 out of 100 women taking Mifeprex will need a surgical procedure because the pregnancy did not completely pass from the uterus or to stop bleeding.

**Who should not take Mifeprex?**

Some women should not take Mifeprex. Do not take Mifeprex if you:

- Have a pregnancy that is more than 70 days (10 weeks). Your healthcare provider may do a clinical examination, an ultrasound examination, or other testing to determine how far along you are in pregnancy.

- Are using an IUD (intrauterine device or system). It must be taken out before you take Mifeprex.

- Have been told by your healthcare provider that you have a pregnancy outside the uterus (ectopic pregnancy).

- Have problems with your adrenal glands (chronic adrenal failure).

- Take a medicine to thin your blood.

- Have a bleeding problem.

- Have porphyria.

- Take certain steroid medicines.

- Are allergic to mifepristone, misoprostol, or medicines that contain misoprostol, such as Cytotec or Arthrotec.

Ask your healthcare provider if you are not sure about all your medical conditions before taking this medicine to find out if you can take Mifeprex.

**What should I tell my healthcare provider before taking Mifeprex?**

**Before you take Mifeprex, tell your healthcare provider if you:**

- cannot follow-up within approximately 7 to 14 days of your first visit

- are breastfeeding. Mifeprex can pass into your breast milk.  The effect of the Mifeprex and misoprostol regimen on the breastfed infant or on milk production is unknown.

- are taking medicines, including prescription and over-the-counter medicines, vitamins, and herbal supplements.
  Mifeprex and certain other medicines may affect each other if they are used together.  This can cause side effects.

Reference ID: 4418041

**How should I take Mifeprex?**

- Mifeprex will be given to you by a healthcare provider in a clinic, medical office, or hospital.

- You and your healthcare provider will plan the most appropriate location for you to take the misoprostol, because it may cause bleeding, cramps, nausea, diarrhea, and other symptoms that usually begin within 2 to 24 hours after taking it.

- Most women will pass the pregnancy within 2 to 24 hours after taking the misoprostol tablets.

**Follow the instruction below on how to take Mifeprex and misoprostol:**

**Mifeprex (1 tablet) orally + misoprostol (4 tablets) buccally**

**Day 1:**

- Take 1 Mifeprex tablet by mouth.

- Your healthcare provider will either give you or prescribe for you 4 misoprostol tablets to take 24 to 48 hours later.

**24 to 48 hours after taking Mifeprex:**

- Place 2 misoprostol tablets in each cheek pouch (the area between your teeth and cheek - see Figure A) for 30 minutes and then swallow anything left over with a drink of water or another liquid.

- The medicines may not work as well if you take misoprostol sooner than 24 hours after Mifeprex or later than 48 hours after Mifeprex.

- Misoprostol often causes cramps, nausea, diarrhea, and other symptoms. Your healthcare provider may send you home with medicines for these symptoms.



**Figure A** (2 tablets between your left cheek and gum and 2 tablets between your right cheek and gum).

**Follow-up Assessment at Day 7 to 14:**

- This follow-up assessment is very important. You must follow-up with your healthcare provider about 7 to 14 days after you have taken Mifeprex to be sure you are well and that you have had bleeding and the pregnancy has passed from your uterus.

- Your healthcare provider will assess whether your pregnancy has passed from your uterus. If your pregnancy continues, the chance that there may be birth defects is unknown. If you are still pregnant, your healthcare provider will talk with you about a surgical procedure to end your pregnancy.

- If your pregnancy has ended, but has not yet completely passed from your uterus, your provider will talk with you about other choices you have, including waiting, taking another dose of misoprostol, or having a surgical procedure to empty your uterus.

**When should I begin birth control?**

You can become pregnant again right after your pregnancy ends. If you do not want to become pregnant again, start using birth control as soon as your pregnancy ends or before you start having sexual intercourse again.

**What should I avoid while taking Mifeprex and misoprostol?**

Do not take any other prescription or over-the-counter medicines (including herbal medicines or supplements) at any time during the treatment period without first asking your healthcare provider about them because they may interfere with the treatment. Ask your healthcare provider about what medicines you can take for pain and other side effects.

**What are the possible side effects of Mifeprex and misoprostol?**

**Mifeprex may cause serious side effects.  See "What is the most important information I should know about Mifeprex?"**

**Cramping and bleeding.** Cramping and vaginal bleeding are expected with this treatment. Usually, these symptoms mean that the treatment is working. But sometimes you can get cramping and bleeding and still be pregnant. This is why you must follow-up with your healthcare provider approximately 7 to 14 days after taking Mifeprex. See "How should I take Mifeprex?" for more information on your follow-up assessment. If you are not already bleeding after taking Mifeprex, you probably will begin to bleed once you take misoprostol, the medicine you take 24 to 48 hours after Mifeprex. Bleeding or spotting can be expected for an average of 9 to16 days and may last for up to 30 days. Your bleeding may be similar to, or greater than, a normal heavy period. You may see blood clots and tissue. This is an expected part of passing the pregnancy.

The most common side effects of Mifeprex treatment include: nausea, weakness, fever/chills, vomiting, headache, diarrhea and dizziness. Your provider will tell you how to manage any pain or other side effects.These are not all the possible side effects of Mifeprex.

Call your healthcare provider for medical advice about any side effects that bother you or do not go away. You may report side effects to FDA at 1-800-FDA-1088.

**General information about the safe and effective use of Mifeprex.**

**Medicines are sometimes prescribed for purposes other than those listed in a Medication Guide. This Medication Guide summarizes the most important information about Mifeprex. If you would like more information, talk with your healthcare provider. You may ask your healthcare provider for information about Mifeprex that is written for healthcare professionals.**

**For more information about Mifeprex, go to www.earlyoptionpill.com or call 1-877-4 Early Option (1-877-432-7596).**

Manufactured for: *Danco Laboratories, LLC*
P.O. Box 4816
New York, NY 10185
1-877-4 Early Option (1-877-432-7596) www.earlyoptionpill.com

This Medication Guide has been approved by the U.S. Food and Drug Administration.    Approval 3/2016

19

Reference ID: 4418041

# HILL DECLARATION

# EXHIBIT D



# Lebanon Division of Police

### Jeffrey W. Mitchell
### Chief of Police

CFS - Command Log | Printed on November 2, 2021

**CFS #**       CFS21020892
**Call Taker**       D2 Carlisle
**Location**       25 W SILVER ST, LEBANON, OH 45036 (LEBANON POLICE DEPT)
**Location Details**
**Primary Incident Code** VC : VICE COMPLAINT
**Priority**       2
**Use Caution**       No
**Primary Disposition**       Report Taken
**Call Time**       10/29/21 10:25:07
**Completed Time**       10/29/21 11:18:46

---

### Reporters

**NORMAN, MICHAEL WAYNE (Initial Reporter)**

**Sex**       Male
**DOB**       1/2/69
**Address**       188 S OAK ST
                LONDON, OH 43140
**Report Time**       10/29/21 10:25:00
**How Reported**       Walk In
**From Phone**       (740) 604-0647
**Contact Phone**
**Comments**

---

### Other Names

---

### Vehicles

---

### Responders

101 (Primary)       101 - Mitchell, Jeffrey       Lebanon PD (Primary)

---

### Response Times

**Assigned**       10/29/21 10:41:57
**Enroute**       10/29/21 10:42:05 *
**Arrived**       10/29/21 10:42:05
**Completed** 10/29/21 11:18:46

---

### IR / External Agency Numbers

---

### Officer Addenda

---

### Command Log Filter: All Commands | Details: Hidden | Units: All Units | Revised Entries: Shown

10/29/21 10:25:07 | Carlisle, D2 | New CFS
10/29/21 10:41:31 | Carlisle, D2 | MEET COMPL IN THE LOBBY
10/29/21 10:41:45 | Carlisle, D2 | STATING THAT MAJOR PHARMACIES IN THE CITY ARE SELLING

10/29/21 10:41:57 | Carlisle, D2 | 101 | DISPATCH
10/29/21 10:42:05 | Carlisle, D2 | 101 | ON SCENE
10/29/21 10:42:13 | Carlisle, D2 | 101 | Check Status (Time (minutes): 30)
10/29/21 10:47:29 | Carlisle, D2 | STATING THAT MAJOR PHARMACIES IN THE CITY ARE SELLING ABORTION INDUCING DRUGS THAT ARE ILLEGAL TO SELL IN THE CITY
10/29/21 10:47:35 | Carlisle, D2 | WANTS TO SPEAK WITH OFFICER
10/29/21 11:12:28 | Carlisle, D2 | 101 | Check Status (Time (minutes): 30)
10/29/21 11:18:46 | Carlisle, D2 | 101 | COMPLETE
11/01/21 11:58:24 | Mitchell, Jeffrey | Michael Norman came to the police department and reported as follows; He was meeting a friend for breakfast in Lebanon and had some "time to kill". He is familiar with the recently passed City of Lebanon legislation regarding banning abortions and with this free time went to the local Walgreens to inquire if that establishment made available any medications used for abortions which would be banned by the city ordinance. He discovered and had printed information from an internet search showing Walgreens has available two drugs; Misoprostol and Korlym. Norman believes both of these drugs are used for ending pregnancies and as such should require Walgreens to not sell the drugs in the city. I asked Norman if the drugs could be used for any other medical purpose (besides ending pregnancies) to which he replied that he did not know. Norman provided three documents regarding the two identified drugs.