IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF SOCIAL WORKERS, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> CITY OF LEBANON, OHIO, et al., <br><br> *Defendants*. | Case No.  1:22-cv-258 |

### DECLARATION OF MARGARET LIGHT-SCOTECE

I, Margaret Light-Scotece, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1. I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction or, in the Alternative, Expedited Summary Judgment. I am over the age of 18. I make these statements based on my personal knowledge.

2. I am the Interim Executive Director of Plaintiff Women Have Options – Ohio ("WHO/O"). I have served as a volunteer since early 2014, and was a board member from October 2017 until January 2022. I have served as the full-time Interim Executive Director since February 2022.

3. WHO/O is a nonprofit corporation organized under the laws of the State of Ohio. Founded in 1992, WHO/O is dedicated to helping Ohioans afford their reproductive choices.

4. WHO/O is a founding member of the National Network of Abortion Funds, which includes more than a hundred abortion funds around the United States and overseas.

1

5. WHO/O provides financial aid and practical support in the form of transportation, housing, and other assistance to help patients access contraception, emergency contraception, and abortion services.

6. Since 1992, WHO/O has helped thousands of Ohioans to pay for their reproductive choices.

7. WHO/O believes that everyone should be able to make their own reproductive choices. WHO/O's mission is to make that belief a reality in Ohio by providing financial and practical assistance to those in need. This often includes various forms of support for individuals seeking to terminate their pregnancies. Some of those terminations would be in violation of various Ohio laws, if those laws were in effect—such as abortions occurring after six weeks of pregnancy, *see* Ohio Rev. Code § 2919.195. Others might be deemed to take place in the City of Lebanon—like medication abortions where a patient takes only the second drug of the regimen, misoprostol, in Lebanon.

8. To carry out its mission, WHO/O relies on two paid full-time staff members, called "resource coordinators," and roughly thirty volunteers.

9. While WHO/O is headquartered in Columbus, Ohio, it serves clients throughout the State of Ohio, including in Lebanon. WHO/O assisted 1020 patients in 2020 and 931 patients in 2021, including by providing them with various forms of support or referring them to other organizations.

10. I have read the text of the Lebanon abortion ordinances passed on May 25, 2021. Lebanon Ordinance 2021-053 ("Lebanon Ban"). Although I found the ordinances nearly impossible to understand, I am very concerned that WHO/O staff members and volunteers

regularly engage in practices that could subject them to the threat of prosecution under the ordinance or whose legality cannot be determined due to the ordinance's vagueness.

11. When a client contacts WHO/O for assistance, either via phone or email, WHO/O sets them up with a coordinator who assesses their situation and figures out their individual needs. WHO/O also sometimes receives referrals from other abortion funds, including national and regional organizations. Under the Lebanon Ban, however, it is unclear whether even these initial consultations, intended to lay out a patient's options, would constitute "aid[ing] or abet[ting]" under the law, if the patient is located in Lebanon.

12. WHO/O's assistance for clients seeking abortions takes various forms. WHO/O provides informational support, emotional support, monetary assistance, and—in some cases—logistical aid to clients seeking abortions. However, I am uncertain whether, among other things, several of these forms of assistance would constitute "aiding and abetting" an abortion; whether they would fall within the Lebanon Ban's exceptions for speech or undue burden; whether WHO/O or its employees or volunteers are persons who have "standing to assert the third-party rights of a woman or group of women seeking an abortion under the tests for third-party standing established by the Supreme Court of the United States"; or whether they would fall within the Ban at all, to the extent they take place outside Lebanon city limits.

13. Some of that assistance is in the form of cash grants directly to abortion clinics to help cover the cost of abortions for patients in need. But WHO/O also provides financial assistance directly to patients to cover expenses associated with travel to an abortion clinic, or other needs associated with undergoing the procedure. For example, when one client's car broke down while she was traveling to get an abortion, WHO/O helped pay for a night in a hotel and to have her car repaired.

14. I am also concerned that WHO/O's donors risk prosecution under the Ban, since they provide funds that are then used for expenses associated with abortions for Ohioans in need. In fact, we widely publicize that all of our individual donations go straight to patient care and support and are not used to cover any of our organizational overhead costs. WHO/O staff also provide information about where a patient can obtain an abortion. I do not know, and I am unable to advise my staff, whether such information, if delivered in connection with a medication abortion in which the misoprostol is taken at home, constitutes "instructions … regarding self-administered abortion" within the meaning of the Lebanon Ban, and I am uncertain whether simply providing information about available options constitutes "aiding or abetting" abortion.

15. The final form of aid WHO/O provides is in the form of logistical assistance or "practical support." Depending on an individual client's needs, WHO/O staff may arrange rides for patients who lack transportation, book hotel rooms for patients requiring an overnight stay, book travel arrangements such as plane tickets or ride services, arrange child care for patients, or help patients obtain documentation, such as a photo ID, needed for the procedure. In 2021 WHO/O provided practical support services for over 30 clients, and worked with national and regional partners to assist with practical support services for many more clients.

16. Sometimes WHO/O employees or volunteers arrange third-party transportation to and from an abortion clinic for an abortion procedure, and WHO/O members have previously driven patients to and from the clinic. If that patient goes to the clinic to seek a medication abortion, they will usually be sent home from the clinic with misoprostol pills (the second drug of the two-drug medication abortion regimen). I cannot tell whether, under the language of the ordinance, driving a patient home from an abortion clinic with misoprostol constitutes "possession" of an "abortion inducing drug" within the meaning of the Ban.

17. Including myself, all staff members of WHO/O have completed an in-person training program to become abortion doulas, and our staff members offer what could be called abortion doula services to patients who request it. It is not necessary to complete a training program in order to serve as an abortion doula, and the term "abortion doula services" can refer to a broad range of emotional and logistical support services, such as referring people to appropriate resources, listening in supportive silence, offering snacks or engaging in light conversation, holding their hand or rubbing their back, sharing information about abortion services, and helping the client to make arrangements for the procedure.

18. It is unclear which of these services would be considered "abortion doula" services within the meaning of the Lebanon Ban, given that the term is not defined in the Ban and is susceptible to multiple meanings. For example, WHO/O staff provide information and emotional support to people who are seeking or receiving abortions, but those services may or may not constitute "abortion doula" services within the meaning of the Ban. Indeed, I have learned that the City Attorney of Lebanon himself defines "abortion doula" services to include "emotional, informational, and logistical support to a person who is seeking or having an abortion." This could potentially describe every service provided by WHO/O.

19. WHO/O has assisted patients who reside in Lebanon with accessing abortions in the past, and I expect that patients who live in Lebanon and need to travel to abortion providers outside of Lebanon will continue to seek out WHO/O's services in the future. WHO/O intends to continue making its services available to patients across the state, regardless of the city in which they happen to live.

20. After passage of the Lebanon Ban, WHO/O took several steps and continues to divert scarce time and resources to protect itself and its staff and volunteers from prosecution under the Lebanon Ban.

21. For example, WHO/O had originally planned on establishing a volunteer-staffed hotline for providing support, However, because WHO/O is concerned about putting volunteers at risk of prosecution under the Ban, WHO/O has avoided asking unpaid staff to answer WHO/O's telephone or email intakes and instead relies only on paid staff for that work. Doing so diverts the time of those staffers away from other organizational priorities. WHO/O staff are unable to spend their time building out new programs including broader transportation, lodging, and childcare networks, facilitating access to emergency contraception for community partners, building relationships with our clinic partners, and driving community conversations about abortion access and the dangers of abortion stigma. Due in part to the risk to volunteers, the Ban has forced WHO/O to further invest in paid staff to manage an ever-increasing demand for assistance. WHO/O is currently intending to hire 2 additional resource coordinators before June 2022 and an additional 2 resource coordinators before the end of 2022 at a cost of over $300,000 to the organization in salary and benefits.

22. WHO/O has also taken time to seek legal advice regarding the possibility of prosecution under the Lebanon Ban and is undergoing consideration of establishing a legal committee, or retaining legal counsel, to assess its compliance with the Ban and other laws concerning abortion. These efforts require WHO/O to divert further staff time and financial resources away from providing assistance to clients. As Interim Executive Director I have spent, and continue to spend, an average of 5-10 hours per week planning for the consequences of legal prosecution under the Lebanon Ban including but not limited to: meeting with legal counsel,

6

revamping intake processes to further protect client information, upgrading our digital security, and meeting with staff to answer their questions and concerns about legal risks to themselves in the course of their employment. WHO/O has also had to divert resources to cover the cost of digital security upgrades.

23. I am further concerned that, if our donors face prosecution under the Ban, this will hinder WHO/O's ability to fundraise and engage with our supporters.

24. However, WHO/O's staff and volunteers remain dedicated to WHO/O's mission. Even if it places them at risk of prosecution, WHO/O's staff and volunteers will continue assisting any client that needs assistance, including within the limits of the City of Lebanon. Refusing to do so would undermine WHO's commitment to defending individuals' rights to reproductive autonomy and its reputation with potential donors, clients, and supporters, even if it were able to do so again in the future. WHO/O, its staff, and its volunteers therefore have a reasonable fear of prosecution under the Ban.

I declare under penalty of perjury that the foregoing is true and correct.

May 9, 2022

_Margaret Light-Scotece_
Margaret Light-Scotece